# Illinois Official Reports

## Appellate Court

---

### *People v. Ramos*, 2018 IL App (1st) 151888

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JUAN RAMOS, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-15-1888 |
| Filed | March 30, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-CR-15650; the Hon. Gregory Robert Ginex, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Sharon Goot Nissim, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, and Brian A. Levitsky, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE DELORT delivered the judgment of the court, with opinion.<br>Presiding Justice Hoffman and Justice Cunningham concurred in the judgment and opinion. |

**OPINION**

¶ 1     After a joint jury trial with codefendant Saul Sandoval, defendant Juan Ramos was convicted of armed robbery with a firearm and sentenced to 29 years in prison.[1] Critical to the State's case was historical cell site analysis (HCSA) evidence which was presented to the jury in the form of testimony from a detective. We find that this evidence was inadmissible hearsay and was prejudicial. We reverse defendant's conviction and remand for a new trial.

¶ 2                                          BACKGROUND

¶ 3     In June 2015, the State charged defendant by indictment with, among other things, one count of armed robbery. 720 ILCS 5/18-2(a)(2) (West 2014). The gist of the indictment was that defendant robbed Francisco Vivas of jewelry while brandishing a firearm. The case proceeded to a jury trial.

¶ 4     At trial, 71-year-old Francisco Vivas testified that on August 3, 2014, he went to Swap-O-Rama, a flea market located at 42nd Street and Ashland Avenue in Chicago, to sell jewelry. Around 4:30 p.m., Vivas left and drove to the Berwyn Fruit Market, a grocery store on Harlem Avenue in Berwyn, Illinois. To travel to the Berwyn Fruit Market from Swap-O-Rama, Vivas took Ashland Avenue to Interstate 55 (I-55), exited I-55 at Harlem Avenue, and proceeded north on Harlem Avenue until reaching the destination. After completing that stop, Vivas drove to Kathleen Snyder's house in Riverside, Illinois, some 1.5 miles away from the Berwyn Fruit Market, to drop off some jewelry.

¶ 5     When Vivas arrived at Snyder's house, two men approached him from behind and attacked him. One of the men pulled Vivas's shirt over his head, and the other took his car keys, opened his car, and removed several bags containing gold jewelry. At that point, Snyder came outside and saw that Vivas was under attack. Vivas heard Snyder yelling and saw one of the men point a gun at her and tell her to "shut up."

¶ 6     Kathleen Snyder testified that she saw Vivas pull into her driveway around 5:30 p.m. When she walked outside to greet him, she heard him saying "call the police" and saw a person, whom she later identified at trial as defendant, beating Vivas's head against one of her car's tires. Snyder also saw another man, whom she later identified at trial as Sandoval, a little further away "dancing around or something." Snyder testified that the attackers had T-shirts covering their faces like masks so that only their eyes and the middle portion of their faces were visible. Snyder asked defendant and Sandoval what they were doing. In response, according to Snyder, Sandoval pointed a gun at Snyder and said, " '[t]his doesn't concern you, bitch.' " They fled in a van shortly thereafter.

¶ 7     Two days later, Vivas and Snyder went to the police station to view a lineup. When the subjects were first presented, their faces were covered with T-shirts so that only their eyes and the middle portion of their faces were visible, similarly to how the attackers appeared during the robbery. However, Snyder told a police officer that one of the suspects had a goatee and asked that the suspects lower their masks. Snyder then saw that one of the men had a goatee. That man was defendant, whom Snyder informed the police was the person she saw assaulting

---

[1]Sandoval filed a separate appeal docketed as case No. 1-15-1887. See *People v. Sandoval*, 2018 IL App (1st) 151887-U.

- 2 -

Vivas. Snyder later identified Sandoval as the person who pulled a gun on her based on the fact that he had "goofy" eyes. Vivas did not make an identification because his head had been covered by his own shirt during much of the attack. However, on August 8, Vivas identified two pieces of jewelry—an earring and a bracelet—that the police recovered during their investigation which he claimed were taken during the robbery.

¶ 8        Detective Frank Lara testified that he worked for the Riverside Police Department and that he assisted with the robbery investigation. Detective Lara testified that he interviewed Snyder at her home. After that conversation, he explained that he "was looking for two male Hispanics" who had T-shirts wrapped around their heads and faces and "were between 5'8" and 5'10" and *** had medium builds."

¶ 9        The following day, Detective Lara went to the Berwyn Fruit Market. There, he met with the store manager and viewed surveillance footage of the store's parking lot. The video showed that at 5 p.m., a white Acura driven by Vivas pulled into the lot and parked. Vivas exited his vehicle and entered the store. A silver SUV then drove down the parking aisle towards the store, passed Vivas's car, and entered the parking lot of an O'Reilly's Auto Shop located across the street, at which point the SUV parked. Twenty minutes later, Vivas returned to his car, left the parking lot, and began traveling North on Harlem Avenue. When Vivas passed O'Reilly's Auto Shop, the silver SUV exited the parking lot and began traveling north on Harlem Avenue.

¶ 10        Detective Lara checked the SUV's license plate number and learned that it was registered to Rene Abeja. That lead ultimately led Detective Lara to a residence at 4909 West 30th Street in Cicero, Illinois, where Detective Lara set up surveillance with another police unit. Detective Lara observed three people emerge from a house, walk into an alley, and load furniture and boxes into a white truck. Two of the individuals, whom Detective Lara later identified as defendant and Sandoval, were male Hispanics, between 5 feet, 8 inches, and 5 feet, 10 inches, had medium builds, and had shirts wrapped around their heads. A short while later, Detective Lara observed the silver SUV, which he had seen on the surveillance footage emerge from the alley, drive past Detective Lara's car, and park. As the SUV passed Detective Lara, he saw Abeja in the driver's seat. At that point, Detective Lara pulled behind the SUV, activated his emergency lights, and detained Abeja. At the same time, officers from the other surveillance unit went into the alley and detained defendant, Moya, and Sandoval. Custodial searches produced a credit card, cell phone, and a gold earring from defendant, and a cell phone from Sandoval.

¶ 11        On August 5, 2014, Detective Lara searched the SUV and recovered a clear necklace and a gold bracelet. Vivas identified the bracelet as belonging to him. Later in the investigation, Detective Lara went to Swap-O-Rama, where he met with the manager and viewed surveillance footage from August 3, 2014. That footage showed Vivas leave Swap-O-Rama around 4:30 p.m., get into his car, and leave traveling south on Ashland Avenue. Then, "within a minute or two," a silver SUV exited the parking lot and also began traveling south on Ashland Avenue. On cross-examination, Detective Lara testified that he was not able to identify the driver of the silver SUV or any of its passengers.

¶ 12        Detective James Lazansky testified that he was a detective with the Riverside Police Department. As part of the robbery investigation, Detective Lazansky served a search warrant on T-Mobile company seeking historical cell site location data for the cell phones recovered from defendant and Sandoval. Detective Lazansky explained to the jury that "cell tower

location history is when you use your cell phone, it pings on a certain tower. So it could be within a short distance of where your phone is hitting." He elaborated: "[w]herever you travel, you're going to go from one tower to another tower to another tower, and your cell phone is going to ping on that certain tower in the area that you're at."

¶ 13 Detective Lazansky then explained that in response to the warrant, "T-Mobile gave us a spreadsheet of all the latitudes and longitudes and dates and times of where the cell phone towers were hitting." Detective Lazansky stated that the T-Mobile records for defendant's phone did not contain any cell tower history for August 3, 2014. However, he testified that the cell tower history for Sandoval's phone "dictated the exact location of Swap-O-Rama and followed the victim exactly how he showed us going down I-55. It kept pinging down I-55 to Harlem Avenue. It pinged at Harlem Avenue; and actually where the crime occurred, it also pinged there." Detective Lazansky explained that a ping "[b]asically *** gives us the latitude and longitude and then you punch in the latitude and longitude into Google Earth, which gives you the exact geographic location of where the phone is hitting on the cell tower."

¶ 14 During defendant's closing argument, defense counsel attempted to use a copy of the trial transcript and notes that he had written on the transcript. When the court became aware of this, it admonished defense counsel in the presence of the jury to put the transcript down. During an ensuing sidebar conference, the court explained, "[y]ou can argue whatever you wish, but no one is to refer to the transcript because it's never been introduced, and it's never been authenticated, and the court reporter's notes have not been requested to be authenticated by anyone."

¶ 15 The jury found defendant guilty of armed robbery, and the court imposed a sentence of 29 years in prison. This appeal followed.

¶ 16                                                    ANALYSIS

¶ 17 Defendant presents nine issues for our review, which span the entire trial, from jury selection to sentencing. Defendant argues that (1) the jury received improper Rule 431(b) admonishments (see Ill. S. Ct. R. 431(b) (eff. July 1, 2012)), (2) his identification was the product of a suggestive lineup, (3) his identification was unreliable, (4) the State failed to prove that a gun was used during the crime, (5) an inculpatory text message found on Sandoval's phone was admitted without proper authentication, (6) the State's HCSA evidence was improper because it was not introduced through a qualified expert, and (7) his sentence was excessive. We need not consider these arguments, however, because two of defendant's other claims are dispositive: (1) that Detective Lazansky's HCSA testimony was inadmissible hearsay and (2) the circuit court improperly restricted defense counsel during closing argument.

¶ 18 We begin with the hearsay argument. Defendant argues that Detective Lazansky's testimony was testimonial hearsay because it was an embodiment of the T-Mobile report, which the State failed to authenticate as admissible hearsay pursuant to the business records exception. See Ill. R. Evid. 803(6) (eff. Apr. 26, 2012). He thus concludes that the introduction of this evidence violated his sixth amendment right to confrontation.

¶ 19 Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Ill. R. Evid. 801 (eff. Jan. 1, 2011). At trial, Detective Lazansky told the jury that the information contained in the T-Mobile report "dictated the exact location of the Swap-O-Rama and followed the victim exactly how he showed us going down I-55. It kept pinging down I-55 to

Harlem Avenue. It pinged at Harlem Avenue; and actually where the crime occurred, it also pinged there." Detective Lazansky explained that the ping information existed in the form of latitude and longitude coordinates, and he explained that he arrived at his conclusion about the phone's movements by plugging the "ping" information into Google Earth to create a map detailing how the phone traveled on August 3, 2014. While it is unclear whether this map was ever shown to the jury, translating the report's raw coordinate data into points on a map was the keystone of Detective Lazansky's testimony. Without the reports, there would be no coordinates; without the coordinates there would be nothing to plug into Google Earth and thus no map; and without a map he would have nothing tell the jury about where Sandoval's phone traveled on August 3.

¶ 20      T-Mobile, which authored the document, was a declarant, and the data showing which towers Sandoval's cell phone pinged, and at what times, was an out-of-court statement. And the only reason Detective Lazansky conveyed this information to the jury was for its truth—that is, to convince the jury that Sandoval's phone followed Vivas around all day on August 3, 2014. That fact is borne out by Detective Lazansky's testimony, which meticulously detailed the cell phone's path of travel and in the State's closing argument, in which the prosecutor emphasized, "we *** know from Saul Sandoval's phone that he was at the Swap-O-Rama at the same time that Mr. Vivas was because we know from his phone that his phone took the same path that Mr. Vivas took."

¶ 21      It makes no difference that Detective Lazansky used Google Earth to convert the raw coordinate data from the T-Mobile report, which was in code and would have been meaningless to the jury, into a format that was actually comprehensible. Information that is hearsay when presented as numerals in a spreadsheet is still hearsay when those numerals are converted to waypoints on a map, and it remains hearsay when that information is conveyed to a jury.

¶ 22      Of course, our finding that Detective Lazansky's HCSA testimony was hearsay does not itself settle the matter, since not all hearsay is inadmissible. Phone records of the sort at issue here are frequently admissible hearsay because they are business records. Ill. R. Evid. 803(6) (eff. Apr. 26, 2012); see *United States v. Yeley-Davis*, 632 F.3d 673, 679 (10th Cir. 2011). But the proponent of a business record must establish, as a prerequisite to its admissibility, "(1) that the record was made as a memorandum or record of the act; (2) that the record was made in the regular course of business; and (3) that it was the regular course of the business to make such a record at the time of the act or within a reasonable time thereafter." *People v. Nixon*, 2015 IL App (1st) 130132, ¶ 110. The State did not put on any witnesses to fulfill this foundational requirement, so the T-Mobile report could not have been admissible pursuant to business records exception.

¶ 23      To be sure, as the State correctly pointed out at trial, some business records are self-authenticating. See Ill. R. Evid. 902(11) (eff. Jan. 1, 2011). But to be self-authenticating, a business record must be accompanied by a certification from the record's custodian or a "qualified person" attesting to the three foundational requirements for business records described above. *Id.* None of the T-Mobile records were certified. As a result, the records were not admissible pursuant to Rule 902(11).

¶ 24      Our next step is to assess whether defendant is entitled to relief. We may only grant relief if the court's error prejudiced defendant, as harmless errors do not require reversal. To determine if an evidentiary error was harmless, we ask whether there is a "reasonable probability that the

jury would have acquitted the defendant absent" the improperly admitted evidence. *People v. Nevitt*, 135 Ill. 2d 423, 447 (1990). We believe there is such a reasonable probability. Detective Lazansky's testimony filled an important gap in Detective Lara's testimony. Detective Lara testified that a silver SUV was following Vivas on the day of the robbery. That SUV was registered to one of defendant's associates, defendant was in its vicinity when he was arrested, and robbery proceeds were found inside it.

¶ 25 Yet, there was no evidence that actually put defendant inside the SUV when it was tailing Vivas. As Detective Lara admitted, it was impossible to determine from the surveillance footage who was inside the SUV. Detective Lazansky's testimony enabled the jury to make that inferential leap and conclude that defendant was in the silver SUV when it was following Vivas. And the jury was likely to do so. Detective Lazansky's testimony was imbued with the presumption of scientific certitude, a characteristic which can be highly persuasive to a jury. See *People v. Wright*, 2012 IL App (1st) 073106, ¶ 96 (acknowledging that certain forms of scientific evidence can have an oversized impact on the jury's deliberations). Thus, if Snyder's testimony left the jury with any doubt that defendant was at the crime scene, it is a virtual certainty that Detective Lazansky's testimony alleviated that doubt. Under these circumstances, we cannot conclude that the improper introduction of this evidence was harmless. Accordingly, we reverse defendant's conviction on this basis and remand for a new trial.

¶ 26 Because we find that this evidentiary error alone entitles defendant to relief, we need not consider defendant's constitutional claim, namely that because T-Mobile report was testimonial in nature, the introduction of this testimony violated defendant's sixth amendment right to confrontation. See *In re E.H.*, 224 Ill. 2d 172, 179-80 (2006) ("When a court is asked to evaluate the admission of out-of-court statements into evidence, the *first* step is determining whether the statement passes muster as an evidentiary matter. *** Only once the statement has first been found admissible as an evidentiary matter should constitutional objections—including *Crawford*-based confrontation clause claims—be dealt with." (Emphasis in original.)).

¶ 27 We also believe it is important to specifically address defendant's claim regarding his attorney's closing argument. When defense counsel began his closing argument, he attempted to use the trial transcript, evidently for two purposes: (1) to augment his argument with direct quotes from the trial testimony and (2) because he had written notes on the transcript. The court forbade defense counsel from using the transcript, apparently out of concern that the transcript had not been authenticated. This was error. "A criminal defendant's right to make a closing summation before the finder of fact is a fundamental right derived from the sixth amendment guarantee of assistance of counsel." *People v. Stevens*, 338 Ill. App. 3d 806, 810 (2003); see *Herring v. New York*, 422 U.S. 853, 858 (1975) ("There can be no doubt that closing argument for the defense is a basic element of the adversary factfinding process in a criminal trial."). The circuit court may place limits on argument, but those limits must be reasonable. *People v. Diaz*, 1 Ill. App. 3d 988, 992 (1971).

¶ 28 We find that the court's blanket prohibition against defense counsel using the trial transcript, on which he had written notes to assist with his closing argument, was an abuse of discretion. First, defense counsel transcribed his own notes that he wished to use during closing argument onto his copy of the transcript, a fact of which he specifically apprised the court following its *sua sponte* objection to defense counsel's conduct. The court never offered

defense counsel the opportunity to transfer his notes to a medium that was acceptable to the court. Thus, by barring defense counsel from even holding the transcript, the court effectively barred defense counsel from using his own notes during closing argument.

¶ 29 Second, with respect to the transcript itself, there is no sound reason to bar an attorney from seasoning his or her closing argument with excerpts from the trial transcript. While a trial court may be justified in restricting the degree to which counsel uses a trial transcript, here the court issued a blanket prohibition on any use of transcripts during closing argument.

¶ 30 The court justified its ruling by explaining that the transcript defense counsel possessed had not been certified as authentic. But in practice the distinction between a certified and uncertified transcript is *de minimis*—the most typical difference is correction of typographical and scrivener's errors. It would be reasonable to bar an attorney from using an inaccurate transcript, but nothing in the record suggests that defense counsel's transcript was inaccurate.

¶ 31 Closing argument is an important part of a jury trial. It is one of only two times that a lawyer is allowed to speak directly to the jury, and it is the only time a lawyer can talk to the jury about the actual evidence in the case and what reasonable inferences the jury should draw from the evidence. *Herring*, 422 U.S. at 862. "And for the defense, closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt." *Id.* For these reasons, the court's actions in this case must be carefully scrutinized.

¶ 32 It is true that the circuit court retains broad discretion to limit the scope of closing argument. *People v. Burnett*, 237 Ill. 2d 381, 389 (2010). Trial judges retain "great latitude in controlling the duration and limiting the scope of closing summations." *Herring*, 422 U.S. at 862. Judges may "limit counsel to a reasonable time and may terminate argument when continuation would be repetitive or redundant," and they may undertake steps to "ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial." *Id.* But the court's ruling here had nothing to do with the *scope* of defendant's argument. Nor was the court's ruling narrowly tailored to ensure that defense counsel's argument did not "stray unduly from that mark"—that is, exceed the bounds of proper argument by, for example, presenting misquoted testimony. The court's complete bar to use of the transcript, even to refer to notes written on it, was an abuse of discretion and prejudicial.

¶ 33 Because the error at issue was constitutional in nature—the circuit court effectively curtailed defense counsel's ability to perform as the "counsel" contemplated by the sixth amendment—the State must demonstrate that it was harmless beyond a reasonable doubt. For the reasons we have already explained, the evidence was closely balanced. That alone is enough to conclude that the court's error was not harmless beyond a reasonable doubt. Moreover, the error likely affected the result at trial. Defense counsel intended to deliver a closing argument focusing on the many contradictions in Snyder's testimony, buttressed by actual quotations from the trial transcript. Defense counsel could not do that because he could not use the transcript. Given the closeness of the evidence at trial, we cannot conclude that outcome at trial would have still been the same had defense counsel been able to use the trial transcript to drive home the various inconsistencies in Snyder's testimony.

¶ 34 In closing, we note that, although the properly admitted evidence presented a close case, that evidence was nonetheless sufficient for the State to sustain its burden of proof. Accordingly, there is no double jeopardy bar to retrial. *People v. Piatkowski*, 225 Ill. 2d 551,

567 (2007).

¶ 35                                           CONCLUSION
¶ 36            For both reasons stated, we reverse defendant's conviction and remand for a new trial.

¶ 37            Reversed and remanded.