**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2019 IL App (3d) 170293-U

Order filed November 22, 2019

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2019

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-17-0293 Circuit No. 10-CF-1840 |
| | ) | |
| JERIMIAH N. PINKERMAN, | ) ) | Honorable Daniel L. Kennedy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE O'BRIEN delivered the judgment of the court.
Justices Lytton and Wright concurred in the judgment.

_____

**ORDER**

¶ 1        *Held*: The court did not err in sustaining the State's objection to counsel's closing argument.

¶ 2        Defendant, Jerimiah N. Pinkerman, appeals his conviction, arguing that the court violated his sixth amendment right to counsel when it improperly sustained the State's objection to counsel's closing argument. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4 In 2010, defendant was charged with two counts of criminal sexual assault (720 ILCS 5/12-13(a)(1), (2) (West 2010)) and one count of attempted criminal sexual assault (*id.* § 12-13(a)(2), 8-4). The case proceeded to a bench trial in March 2016.

¶ 5 The evidence established that K.V. and her boyfriend, Max Sellars, hosted a poker party on the evening of September 5, 2010. The party consisted mainly of playing poker and drinking alcohol in their apartment's detached garage. Approximately 8 to 10 people attended the party, including defendant, who was Sellars's nephew. K.V. testified that she "was drinking lemonade and UV Vodka and a couple of shots of Southern Comfort." She stated that she had consumed approximately five to seven mixed drinks and two to three shots. Between 12 and 12:30 a.m., K.V. entered the apartment and went to sleep in the bedroom she shared with Sellars. She went to bed by herself. When she got into bed, she was wearing a T-shirt, pajama pants, and underwear. At that point, no one else was sleeping in the apartment. Some people, including Sellars and defendant, were still playing poker in the garage. At some point in the night, she woke up and went to the bathroom because she was not feeling well. She then returned to bed.

¶ 6 Between 5 and 5:30 a.m., K.V. "was woken up by [defendant] on top of [her]." At that time, she was still wearing a T-shirt, but her pajama pants and underwear were off. She had not removed them herself. Defendant was completely naked and "his penis was in [her] vagina." K.V. asked what defendant was doing and told him to get off of her. She repeated this statement. She stated that she tried to get defendant off her by "kicking and scratching at him." She "was trying to scratch him, push him by his shoulders just to get him off [her]." After approximately 30 to 40 seconds, K.V. was successful in pushing defendant off. K.V. put on a pair of pajama pants and went out onto the porch. Defendant followed her. K.V. told defendant to leave and that she was going to call the police. Defendant stated that K.V. was not going to call the police because

defendant's child was in the spare bedroom. K.V. stated, "I went back inside and I laid down on the couch next to [Sellars], and then I watched [defendant] take the house phone and take the battery out and throw it in the garbage so [she] couldn't call anybody. And then [she] woke up [Sellars]." Defendant returned to the bedroom. K.V. told Sellars what had happened. She "scream[ed] hysterical[ly]," "Your nephew just raped me in our bedroom." Sellars "pulled [defendant] out of the bedroom, and *** they started fighting." The fighting continued in the living room and kitchen, before moving outside. Someone then called the police, and officers arrived at the apartment.

¶ 7 The police broke up the fight and placed Sellars in handcuffs. K.V. "told [the officer] they had the wrong person in cuffs. That [defendant] had raped [her] prior to this happening and then [Sellars] had gotten up and was fighting with [defendant] and that is why *** the cops were called." The officers then removed the handcuffs from Sellars, put them on defendant, and placed defendant into the squad car.

¶ 8 K.V. spoke with Officer Randall Szmergalski at the scene. She told him that she had consumed six or seven mixed drinks the night before. She did not remember giving Szmergalski a handwritten statement that day. K.V. said that she did not write every detail down in the statement. She went to the hospital to be examined and a rape kit and saliva sample were performed. She had had intercourse with Sellars within 24 to 72 hours prior to the incident, but not the evening or day prior to being woken up by defendant.

¶ 9 K.V. was interviewed by Detective William Sheehan at the Lockport Police Department. She stated that the day of the incident and the day after were "[a] big blur." She stated that since the trial was 5½ years after the incident, she did not remember every detail she told everyone, but she remembered the details of the actual sexual assault.

3

¶ 10     Sellars testified that because of the alcohol consumed, defendant and defendant's son stayed the night. Sellars told defendant that he and his son could stay in the spare bedroom. Sellars fell asleep on the couch in the living room. He woke up to K.V. screaming and crying in the hallway, directly in front of Sellars, saying that defendant raped her. Sellars did not remember K.V. lying on the couch with him. Sellars walked toward her and looked into the spare bedroom where defendant was supposed to be sleeping, but he was not there. Sellars looked into his and K.V.'s bedroom and saw defendant lying on the bed in his underwear. Sellars entered the room and grabbed defendant and struck him. They continued fighting in the kitchen and then outside. K.V. tried to break up the fight. Sellars remembered being handcuffed and placed in the backseat of a squad car. He gave a verbal statement to Sheehan and told him that he was still drunk while he was fighting with defendant. He allowed DNA to be taken by the police.

¶ 11     Sheehan testified that he met with defendant at the police station that morning. Defendant "was a little beat up. His knees had a lot of scratch marks on them. He was wearing a pair of shorts, no shirt. He had some scratch marks on his neck, shoulder, back." Defendant was wearing two pairs of underwear beneath the shorts. Sheehan took buccal swabs of defendant's mouth and penis. Sheehan took photographs of defendant, which showed some scratches on defendant's left and right shoulder/back and the left side of his neck. K.V. did not tell Sheehan that she had worn pajama pants to bed or that she told defendant she would call 911. When processing the crime scene, Sheehan saw what appeared to be a battery in the garbage can, but he did not write it in his report. Sheehan stated that during the interview defendant told him that he had worn jeans and a T-shirt to bed. When asked during the interview who was sleeping in the bed that he climbed into, he stated that he did not know. During the interview, defendant first said that his son slept in the other bedroom, then he later said that his son slept on the couch.

¶ 12    Dr. David Mikolajczak testified that he was an emergency room (ER) doctor at Silver Cross hospital and testified as an expert in ER medicine. He performed a sexual assault examination on K.V. Mikolajczak did not note any injuries on K.V. or any abnormalities. When asked whether his examination was inconsistent with a female who had been sexually assaulted, Mikolajczak answered, "No."

¶ 13    The parties agreed to a stipulation that if Jennifer Appel was called to testify, she would state that she was a registered nurse in the ER at Silver Cross hospital. She interviewed K.V. regarding the alleged sexual assault and was present during Mikolajczak's examination. The stipulation said that Appel "noted that [K.V.] appeared in no apparent distress, her behavior was anxious, she was crying and smelled of alcohol." Attached to the stipulation was the rape kit documentation form. The form included a short description of what happened, handwritten by Appel, which stated,

> "[K.V.] stated that she was drinking and went to bed by herself woke up not feeling well went to the bathroom and went back to bed. When she awoke again her boyfriend's nephew was on top of her and inside her. She was attempting to push him off and then began to scratch at him. Finally she got him off by kicking him in the chest. She didn't have any underwear on when she woke up. She went outside and then came back in and sat on the couch. Then she went back to the bedroom and woke her boyfriend."

¶ 14    William Anselme testified that he was a forensic biologist for the Illinois State Police. He was admitted as an expert in forensic biology. He tested K.V.'s vaginal swab from the rape kit and found trace amounts of semen, which was "the least amount." He stated that the chances of finding semen was less if the perpetrator had not ejaculated during intercourse.

5

¶ 15          Katherine Sullivan testified as a forensic DNA analysis expert. She worked for the Illinois State Police crime laboratory in Joliet as a forensic scientist. She tested the penile swab taken from defendant and the DNA extracted from it matched defendant's DNA and did not match Sellars's DNA.

¶ 16          Lyle Boicken testified as an expert in forensic biology and forensic DNA analysis. He worked at the Illinois State Police crime laboratory as a forensic scientist and performed DNA analysis in this case. Boicken tested the vaginal swab and found a mixture of two people. The major female DNA profile matched K.V. The minor DNA profile was consistent with Sellars and excluded defendant. Boicken stated that it is possible for there to be penis to vagina penetration and not be able to identify a person's DNA profile. Boicken gave some examples of why this might happen, stating, "cases where an individual did not wear a condom, extremely low amount of semen was present, there was maybe more DNA from one person than the other where you have basically preferential amplification of a profile over another profile." He said that without ejaculation, he would not expect defendant's DNA to be found. Boicken also conducted DNA analysis on swabs collected for possible bodily fluids from defendant's penis and obtained a mixture of three people: defendant and two female DNA profiles, from which K.V. could not be excluded. He conducted DNA analysis on the swabs used to collect cellular material from under K.V.'s fingernails. The DNA profile on her right hand matched Sellars and did not match defendant. The DNA profile from her left hand matched defendant and did not match Sellars.

¶ 17          When asked whether Sellars's DNA would be present on defendant's penis if defendant had sexual intercourse with K.V., Boicken said it was possible, but he would not necessarily expect it. He said that Anselme's notes "indicated that there was a very low amount of semen indicated and also a very low amount of sperm cells identified." He then said,

"So if semen was—in my opinion, the semen was potentially deposited prior, maybe one to three days up to five days before the alleged assault occurred. And because the presence of semen is in such a low amount, it would all depend on whether—where the nurse would take the sample itself.

In that area, the nurse I believe generally takes a sample from the cervical area or maybe some folds within the vaginal area. So if this is—if that is true, then it's potentially—it's a possibility that sex could have occurred without the transfer of semen due to the low amount of semen identified."

Boicken stated that the less sperm cells present, the less likely there would be a transfer of Sellars's DNA to defendant. Boicken stated that K.V.'s DNA could have been transferred onto defendant's penis through oral sex or "a considerable amount" of skin contact. However, he would not have expected it to occur from a simple touch.

¶ 18        The parties agreed on a stipulation that if Szmergalski was called, he would testify that he was on duty the day of the incident and was dispatched to the apartment at approximately 6:51 a.m. He observed defendant walking away from the apartment. Szmergalski stopped his squad car and told defendant to approach the car. Defendant continued to walk away. Szmergalski caught up to defendant and again told him to stop. He then located Sellars exiting the apartment complex. Sellars "appeared to have been in a fight." Sellars appeared angry and was yelling profanities. Szmergalski told Sellars to calm down. When Sellars did not do so, Szmergalski handcuffed him and placed him in the squad car. Szmergalski approached K.V. to ask what was going on. K.V. told him that defendant had raped her and that she had woken up Sellars to tell him and the two men got into a fight. K.V. told Szmergalski that they had a party the night before, during which she had consumed six or seven mixed drinks. She was wearing underwear and a shirt when she

7

went to bed. She got up to use the bathroom in the night because she felt sick. She woke up at 3 or 4 a.m. with only a shirt on and defendant was on top of her with his penis in her vagina. She was able to fight defendant off by kicking and scratching him. "[K.V.] stated that her boyfriend [Sellars] was asleep next to her but did not wake up during this incident." She saw defendant take the battery out of the phone and put it in the garbage. Defendant went back into the bedroom and laid next to Sellars. K.V. then went into the bedroom and woke Sellars up to tell him what happened, which is when the fight ensued.

¶ 19    Karl Reich testified as a defense expert that he was "the chief scientific officer of Independent Forensics which is an independent non-governmental forensic laboratory." He reviewed the reports from the Illinois State Police crime laboratory. Reich stated that, based only on the vaginal swab, there was no evidence that any contact took place. He said that, if defendant had sexual intercourse with K.V., there are three reasons why his DNA would not appear: (1) there just was not enough material, (2) the testing was not done accurately, or (3) there was no contact. He stated that it appeared that the testing was performed accurately, but they did not use the more informative Y-STR test. Reich stated that if defendant and K.V. had had sexual intercourse, he would have expected to find Sellars's DNA on the penile swab. It was his opinion that no intercourse occurred between defendant and K.V. He believed that K.V.'s DNA on defendant came from some other contact, like secondary transfer. Reich stated that if K.V. had scratched defendant to fight him off, he would expect to find defendant's DNA under K.V.'s fingernails on both hands. Reich stated the DNA under her fingernails speak to a physical interaction but nothing inherently sexual. On cross-examination, Reich agreed that sexual contact could occur without any male DNA presenting. He could not say with 100% certainty that Sellars's DNA would have transferred

to defendant's penis if contact occurred. Reich conceived two scenarios in which Sellars's DNA would not transfer to defendant's penis, stating,

> "So it could be that there was not enough of Mr. Sellars' seminal fluid in the complainant's vaginal vault in order to transfer. That is possible. It could be that the penetration was so—I won't say minor but external that the penis didn't actually make contact with where the semen was. I think that is far less likely because of the issues with the vaginal swabs that were tested, but it is possible."

He stated that sexual contact is one way that K.V.'s DNA could be on defendant's penis.

¶ 20 Defendant testified that over the course of the evening he consumed, "a six pack of Killian's beer, *** a mixed drink of UV Vodka and Monster energy and two shots of Southern Comfort liquor." He stayed the night at the apartment because he "felt that it would be better to not drive having had drank for the last several hours." However, he "did not feel incoherent." Defendant did not remember when he went to bed, but he thought that it was 1 or 2 a.m. K.V. had gone to bed before then. Defendant's son was sleeping in the other bedroom. Defendant slept in Sellars's and K.V.'s bedroom. Defendant had asked Sellars where he could sleep and, "He had said [his] bed is fine. It is open. Anywhere you fall I think was the words that he used specifically." However, defendant stated that Sellars never specifically told him to go sleep in that bed. Defendant said that no one was in the bed when he went in there. He only wore underwear to bed. He woke up "to [Sellars] with his hands around [defendant's] neck strangling [him] and screaming." Defendant got out of bed, put on a pair of shorts that were on the floor, and went to get his son from the other room. The shorts belonged to Sellars and had a pair of underwear inside. Defendant put both the shorts and the underwear on. As defendant tried to leave the apartment, Sellars followed him. The fight continued outside. K.V. broke up the fight a couple of times. From

9

the fight, he sustained scraped knees and scratches to his neck and shoulders. Defendant was asked, "did you at any time have sex [with K.V.]" Defendant said, "No." Defendant also stated that he did not remove K.V.'s underwear or pajama pants, nor did he go outside with K.V. or take the battery out of the phone. Defendant said that he was not "at any time aware that [K.V.] was in bed with [him]." He repeatedly told the officers during his questioning that he did not have "sex" with K.V.

¶ 21        During closing arguments, defense counsel discussed the inconsistencies in K.V.'s statement. Counsel then stated,

"[K.V.]'s testimony was is she went to bed early. She went to bed first about, 12:00 or 12:30 p.m. (sic)

Not only did she go to bed first, she wasn't feeling well. She had too much to drink and she went to her bed, as you should.

She said she got up—she's not sure when she got up, and she was feeling ill, went to the bathroom, was in there for a while, came back, that nobody was in her bed. What I would submit to the Court based on the evidence is that [defendant] was already in the bed at that time, that [K.V.], perhaps rightfully, her house, her bed, assumed that it was *** Sellars, her boyfriend, in the bed and just went to bed like she always normally did, and didn't even think twice about it and but now, years later, she is saying there was nobody in the bed, and you might recall, Judge, from the testimony, [defendant] and *** Sellars have a similar build, same height, maybe about 20-pounds different in weight. If you are laying in a bed covered with a blanket, who is going to know the difference, especially if you have been drinking and you're half drunk, maybe more than half drunk, okay? We know that she was

10

not feeling well from all the drinking she had done during the day, so we have that inconsistency as well."

Later counsel stated,

"Let's get to the real meat and potatoes of the DNA testing, though, and where the real dispute lies, and that is the penile swab. Penile swab of [defendant] showed [K.V.] present along with another female.

Now [defendant] didn't offer any evidence of how she got there because he doesn't know because he was asleep when he was awoke by his uncle choking him saying: You raped [K.V.] You raped [K.V.]

But based upon the evidence, and based upon the testimony from *** Boicken himself, we asked him—he said that there was a lot of sample there, okay? Well, what would give rise to a lot of sample, *** Boicken?

Well, skin contact, saliva contact, okay? Maybe he gave a couple other ones. Oh, saliva contact. I think the evidence suggests that what really happened that night is that [K.V.] woke up in a romantic mood, assumed it was her boyfriend next to her, and started to perform oral sex on him."

At that point, the State objected, stating, "Calls for facts not in evidence." The court sustained the objection. Immediately after, defense counsel continued, stating,

"Judge, I think it's a reasonable conclusion to be drawn from the evidence based on the testimony. The testimony that it could have come from saliva, that was his testimony, Judge, all right? Sure, it's not—sure, there's been no evidence that showed that, but it's a reasonable conclusion. So [K.V.], after doing whatever it was she did, perhaps comes—now she's embarrassed. She doesn't know if her

11

boyfriend who is either in the bed or on the couch saw it, doesn't know if [defendant] remembers it, and now she has to make up her story. That is her motive, and she made up a whopper of a story.

Sure there was no animosity between [defendant] and [K.V.] before this. [Defendant] didn't testify about any animosity between him and [K.V.] And [K.V.] said no, there was no animosity between them, but this one incident where she thinks her boyfriend is in bed next to her, all right, now all of a sudden, she's got to make up a story based on what happened, and she told a whopper of a story, and it just got bigger and bigger."

The State did not object again.

¶ 22 After taking the matter under advisement, the court found defendant guilty of two counts of criminal sexual assault. The attempted criminal sexual assault merged with the other two counts. Defendant filed a motion to reconsider and a motion for a new trial. During a hearing on the motions, the following exchange occurred:

"[DEFENSE COUNSEL]: [D]uring closing arguments when [defense counsel] attempted to argue some sort of, I guess for lack of a better word, some sort of sexual act initiated by [K.V.] as being the cause or the result of what took place in this case as being the actual explanation for the evidence, the Court actually sustained that objection and in my opinion that the Court did so in error. And essentially by not considering that as an appropriate argument to make, that suggests that there was not the reasonable inference that could be drawn from the evidence that was presented, which means the Court would not have considered that argument an explanation for the evidence.

12

THE COURT: So you're saying that you presented perjured testimony?

[DEFENSE COUNSEL]: I'm sorry?

THE COURT: You're saying your side presented perjured testimony, if I take your argument as a whole.

[DEFENSE COUNSEL]: In what regards?

THE COURT: By calling the defendant and having him testify.

[DEFENSE COUNSEL]: Judge, my client testified that when he was awoken, the only thing he recalled taking place was *** Sellars attacking. It was his testimony that he did not know or believe anything sexual took place between him and [K.V.] It's entirely possible, and so my argument would be—and as I go through it, Your Honor, I don't want to put the cart before the horse here, that when we start to consider some of the information that was conveyed to the police, the timeline of the events, the amount of alcohol consumed, couple that with the forensic evidence, there is a reasonable argument to be made whereby [K.V.] mistakenly thought that she was in bed with *** Sellars and she initiated some sort of sexual act on [defendant], realized it was [defendant] and then essentially what happened is she was upset, she was distraught, a ruckus ensued and then the fight started and here we are today.

THE COURT: Okay. Continue."

The court denied the motions. Defendant was sentenced to five years' imprisonment.

¶ 23                                    II. ANALYSIS

¶ 24        On appeal, defendant argues the trial court violated his sixth amendment right to counsel when it improperly sustained the State's objection to counsel's closing argument, preventing

13

counsel from presenting the defense theory of the case. We find that the court did not abuse its discretion when it granted the State's objection. Moreover, because defense counsel did in fact argue his theory of the case, we find that defendant's right to present his defense was not violated.

¶ 25    At the outset, we note that the parties disagree on the procedure we should take in deciding this case. The State argues that the case can be disposed of solely on the issue of whether the court abused its discretion in sustaining the objection. Defendant argues that we can skip that question entirely and decide the case solely on the constitutional issue raised. It has been "the long-recognized policy [of the supreme court] that 'cases should be decided on nonconstitutional grounds whenever possible, reaching constitutional issues only as a last resort.' " *People v. Melchor*, 226 Ill. 2d 24, 34 (2007) (quoting *In re E.H.*, 224 Ill. 2d 172, 178 (2006)). *E.H.* set forth a procedure for considering cases such as this, stating:

> "The first question is whether the circuit court erred in ruling that [the] statements were admissible ***. If this ruling was error, the next question is whether that error was harmless. If it was error and it was not harmless, that ends the case and [the respondent] must receive a new trial. Only if the circuit court's *** ruling was not error, or was error but harmless (under the harmless error analysis applicable to that ruling), should the court turn to the constitutional challenge to the evidence." *E.H.*, 224 Ill. 2d at 180.

Thus, we will first consider whether the court erred in sustaining the objection and, if so, whether any error was harmless. Only if we find no error or harmless error, will we determine whether we need to consider defendant's constitutional argument.

¶ 26    "The regulation of the substance and style of closing argument lies within the trial court's discretion; the court's determination of the propriety of the remarks will not be disturbed absent a

14

clear abuse of discretion." *People v. Caffey*, 205 Ill. 2d 52, 128 (2001). A trial court abuses its discretion only when its ruling is arbitrary, fanciful, or unreasonable, or no reasonable person would take the view adopted by the trial court. *People v. Crump*, 2018 IL App (3d) 160124, ¶ 15. Closing arguments must be reviewed in their entirety. *Caffey*, 205 Ill. 2d at 131. "It is improper to argue assumptions or facts not based upon the evidence in the record." *People v. Johnson*, 208 Ill. 2d 53, 115 (2003).

¶ 27        Here, during closing arguments, defense counsel stated, "[K.V.] woke up in a romantic mood, assumed it was her boyfriend next to her, and started to perform oral sex on him." After this statement, the State objected on the basis that it called for facts not in evidence. The court sustained the objection. We cannot say that the court's decision to sustain the objection was arbitrary, fanciful, or unreasonable, or that no reasonable person would have done the same. Nowhere in the record is there evidence to suggest that K.V. "woke up in a romantic mood."

¶ 28        As we found that the court did not abuse its discretion in sustaining the objection, we next turn to the question of whether defendant's right to counsel was violated. Specifically, defendant contends that, by sustaining the objection, the court prevented counsel from presenting the defense theory of the case. "The standard of review for determining whether an individual's constitutional rights have been violated is *de novo*." *People v. Burns*, 209 Ill. 2d 551, 560 (2004).

> "A criminal defendant's right to make a closing summation before the finder of fact is a fundamental right derived from the sixth amendment guarantee of assistance of counsel. [Citation.] The trial court lacks discretion to deny a defendant his right to make a proper argument at closing on the evidence and applicable law in his favor." *People v. Stevens*, 338 Ill. App. 3d 806, 810 (2003).

15

¶ 29    While the court sustained the State's objection to one sentence of defense counsel's closing argument, counsel was still able to present its theory of the case. When reviewing the entirety of defense counsel's closing arguments, it is clear that counsel was not prevented from making the argument that K.V. may have performed oral sex on defendant. Prior to the objection, defense counsel argued, K.V. was

> "not sure when she got up, and she was feeling ill, went to the bathroom, was in there for a while, came back, that nobody was in her bed. What I would submit to the Court based on the evidence is that [defendant] was already in the bed at that time, that [K.V.], perhaps rightfully, her house, her bed, assumed that it was *** Sellars, her boyfriend, in the bed and just went to bed like she always normally did, and didn't even think twice about it."

Counsel noted that Sellars and defendant were about the same height, weight, and build and mentioned that Boicken testified that K.V.'s DNA could have been from saliva. Moreover, after the objection was sustained, counsel continued making the same argument, stating,

> "Judge, I think it's a reasonable conclusion to be drawn from the evidence based on the testimony. The testimony that it could have come from saliva, that was his testimony, Judge, all right? Sure, it's not—sure, there's been no evidence that showed that, but it's a reasonable conclusion. So [K.V.], after doing whatever it was she did, perhaps comes—now she's embarrassed. She doesn't know if her boyfriend who is either in the bed or on the couch saw it, doesn't know if [defendant] remembers it, and now she has to make up her story. That is her motive, and she made up a whopper of a story.

16

Sure there was no animosity between [defendant] and [K.V.] before this. [Defendant] didn't testify about any animosity between him and [K.V.] And [K.V.] said no, there was no animosity between them, but this one incident where she thinks her boyfriend is in bed next to her, all right, now all of a sudden, she's got to make up a story based on what happened, and she told a whopper of a story, and it just got bigger and bigger."

Thus, defense counsel was not prevented from arguing his theory of the case, and defendant's right to counsel was not violated.

¶ 30        In coming to this conclusion, we reject defendant's contention that

"it is clear from the record that the trial court did not consider the argument, and indeed, was predisposed against it: when counsel and co-counsel raised the issue in the motion for new trial, the trial court immediately and *sua sponte* accused [defendant] of perjury based on his denial of having sex with [K.V.]"

First, there is no indication in the record that the court did not consider defense counsel's argument. Just because the court did not *accept* counsel's argument does not mean it did not consider it. Second, we fail to see how the court's comments during a posttrial motion could mean that it was predisposed against, or prejudged (as defendant argues later in his brief), the argument at trial. The very nature of a posttrial motion is that it happens after the trial, meaning that the court as the trier of fact has already considered the evidence and argument of counsel, and had already accepted and/or rejected the narratives and evidence presented. The court's comment at the hearing on the posttrial motions may reflect whether the court, when deciding the case, failed to accept defense counsel's theory, but it does not show that the court was predisposed against the argument at the time counsel made it during closing arguments. Third, while the court did interject a question about

17

whether counsel presented perjured testimony at the start of counsel's argument, it allowed counsel to respond to that question, and appeared to be satisfied with counsel's explanation.

¶ 31 Moreover, we find the cases relied on by defendant, *Stevens*, 338 Ill. App. 3d at 806, and *People v. Ramos*, 2018 IL App (1st) 151888, distinguishable. In *Stevens*, the court continuously interrupted defense counsel during closing arguments limiting the amount of time he had to argue and making comments showing that he had prejudged the case. *Stevens*, 338 Ill. App. 3d at 810. In *Ramos*, defense counsel was prevented from using any of his prepared notes or the trial transcripts when presenting his closing arguments. *Ramos*, 2018 IL App (1st) 151888, ¶¶ 27-28. Here, the court solely sustained an objection, and defense counsel was able to present his argument.

¶ 32 Even if defendant's right to counsel was violated, we find such error to be harmless. Defendant argues that sustaining the objection, here, amounts to structural error and is, thus, not subject to harmless error analysis. "[T]here is a limited group of errors that have been found to be 'structural' and therefore beyond the scope of harmless-error review," including "complete denial of counsel." *People v. Thurow*, 203 Ill. 2d 352, 364 (2003); see also *United States v. Cronic*, 466 U.S. 648, 659 (1984). Defendant "concede[s] that counsel was allowed to argue against the State's case." Thus, if there was a denial of defendant's right to counsel, it would be a partial denial, not a complete denial. Defendant appears to want us to extend structural errors to include *any* denial of counsel, not just a complete denial. We will not do so, and defendant cites no caselaw which does so. Moreover, in *Ramos*, the First District did consider a partial denial for harmless error. *Ramos*, 2018 IL App (1st) 151888, ¶ 33.

¶ 33 When conducting harmless error analysis, we determine whether the outcome would have been the same regardless of the error. *People v. Mullins*, 242 Ill. 2d 1, 23 (2011). As stated above, defense counsel was given the opportunity to present the defense theory of the case even though

18

the court sustained the State's objection. Had the court overruled the objection, defense counsel would have presented the same theory. Moreover, the court considered all of the evidence presented for both sides.

¶ 34    K.V. testified that she woke up to defendant on top of her with his penis in her vagina and scratched and kicked him to get him off her. Defendant had scratch marks on his neck and both sides of his shoulders and his DNA was found under the fingernails of K.V.'s left hand. K.V.'s DNA was also found on defendant's penis. Both experts stated that defendant's DNA would not appear on the vaginal swab if there was not enough material, such as if defendant had not ejaculated. Trace amounts of Sellars's DNA was found on K.V.'s vaginal swab. Boicken testified that he would not have expected Sellars's DNA to transfer to defendant during intercourse if there was a low amount of Sellars's DNA. Reich testified that while he would have expected it, it was possible that Sellars's DNA would not transfer to defendant if only small amounts of Sellars's DNA was found in K.V. Boicken testified that saliva is one way that K.V.'s DNA could have gotten onto defendant's penis. There were undoubtedly inconsistencies with both K.V.'s and defendant's stories. It is unclear from all the testimony who was in the bed. However, there was nothing else to suggest that oral sex had taken place. Defendant did not testify that any sexual acts took place and affirmatively stated that they did not have "sex." Even if the court had overruled the objection, the outcome of trial would have been the same.

¶ 35                                III. CONCLUSION

¶ 36    The judgment of the circuit court of Will County is affirmed.

¶ 37    Affirmed.