2021 IL App (2d) 190380-U
No. 2-19-0380
Order filed May 5, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-2854 |
| JOSE L. BORJON JR. | ) ) | Honorable George D. Strickland, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court.
Justices Hutchinson and Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*:    In appeal of defendant's conviction of unlawful possession of a weapon by a felon, (1) plain-error review did not extend to a forfeited argument that the trial court erred in allowing evidence of defendant's silence in response to officer's question whether defendant had discarded a handgun while fleeing the police; and (2) the trial court did not err in sustaining the State's objection to defense counsel's comment in closing argument that an evidence technician at the scene of defendant's arrest joked about planting evidence; moreover, any such error was harmless.

¶ 2    Following a jury trial in the circuit court of Lake County, defendant, Jose L. Borjon Jr., was found guilty of unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2018)) and was sentenced to a seven-year prison term. Defendant argues on appeal that the

admission of evidence that he remained silent when asked if he discarded a handgun was plain error. He also argues that the trial court improperly restricted his closing argument. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      At trial, Waukegan police officer Oscar Magpali testified that, on December 16, 2018, between 9 and 10 p.m., he stopped a Honda Civic occupied by defendant and Derek Ruiz. Ruiz was driving. Magpali stopped the vehicle in connection with a report of criminal damage to property. Officer James Smith was also dispatched to the scene. Smith indicated to Magpali, nonverbally, that he smelled the odor of cannabis coming from the Honda. Magpali smelled cannabis as well. The officers asked Ruiz and defendant to exit the vehicle. Magpali conducted a pat-down search of Ruiz but did not recover any weapons or contraband. Magpali observed defendant walk to the rear of the Honda and throw his phone on the trunk. Defendant then began to run. Magpali and Smith pursued him.

¶ 5      While defendant was running, Magpali saw him reach into his waistband and discard a black or dark-colored object near a fence. Magpali testified that he saw Smith shine his flashlight near "the third section of the fence line." Smith stopped pursuing defendant but Magpali continued to do so, and defendant eventually surrendered to him.

¶ 6      Officers Michael Reyes and Brandon Klein arrived at the scene, and Magpali told them to go to the portion of the fence where he had seen defendant discard the object. After placing defendant in his squad car, Magpali proceeded to the same area. There, he observed a small black 9-millimeter handgun. He testified that the gun was dry. A marijuana cigarette and a billy club were found during a search of the Honda.

¶ 7      Smith testified that he was called to assist Magpali. He asked defendant to exit the Honda and instructed him to move toward the rear of the vehicle and put his hands on the trunk. Defendant

threw his cell phone on the trunk and fled on foot. Smith saw defendant throw a black pistol toward a chain link fence. Smith testified that defendant threw the pistol toward the fence's third section from the corner. (Smith explained that he considered each fence post to mark a section of the fence.) Smith immediately shined his flashlight on the fence, and he saw a black pistol. Smith continued the pursuit until Magpali caught up with him. At that point, Smith went back to attend to Ruiz. When Klein and Reyes arrived, Smith directed them to the third section of the fence.

¶ 8 Klein testified that when he arrived at the scene, he observed defendant on the ground in handcuffs. Magpali instructed Klein to proceed to the Honda. Smith indicated that an object had been thrown about three posts down the fence line. Klein and Reyes walked to that area, where they found a black 9-millimeter handgun. Klein testified that the handgun was dry and clean and was not covered with any leaves or other objects.

¶ 9 Waukegan police officer Brian Budris testified that he was trained as an evidence technician. He was dispatched to the scene, and when he arrived, defendant was on the ground in handcuffs. Budris asked defendant whether he had dropped a handgun. He asked because he was concerned about the safety of the community and his fellow officers. Budris testified that defendant did not respond to his questions.

¶ 10 A video recording from Budris's body camera was admitted into evidence and played for the jury. On the recording, Budris asked defendant what he threw on the ground and whether it was a gun. Defendant did not respond. A portion of the audio was then redacted and when the audio returned, Budris asked defendant "Is it a gun or not?" Defendant responded, "I don't have nothing."

¶ 11 Budris learned that other officers had discovered a handgun, and he proceeded to where it had been found. Magpali, Klein, and Reyes were standing over the handgun. Budris testified that

it was clean, dry, and free of debris or rust. Budris took custody of the gun as evidence and secured it in his squad car. He later transported it to the police station where he photographed it, packed it in a box, and placed it in an evidence locker.

¶ 12    After taking custody of the gun, Budris searched the Honda. In addition, other officers gave him items found in the Honda, including a police baton. The body camera video shows Budris holding the baton. He can be heard to say, "If I ask him if I can have it, will he let me have it?" He also said, "I'm just gonna fucking take this." Budris acknowledged making the above statements but testified that he was joking. He further indicated that when he said he was going to take the baton, he meant he was going to take it as evidence, not that he was going to take it for himself. He further explained that he took the baton into evidence because, "[i]t's a weapon; not to be left in a vehicle or unattended."

¶ 13    Budris was shown several exhibits during trial. He identified State's exhibit No. 1A as the handgun found at the scene. He was able to identify it based on its manufacturer, model, and serial number. It was stipulated that the handgun was examined for the presence of DNA and fingerprints, neither of which were found. Also, the weapon was test-fired and found to be in operating condition.

¶ 14                               II. ANALYSIS

¶ 15    Defendant first argues that the State improperly admitted evidence that he did not respond when Budris asked him whether he had dropped a gun. Defendant claims that the evidence violated the tacit-admission rule, which has recently been described as follows:

> "Under the tacit admission rule, a defendant's silence may be introduced as a tacit
> or implied admission of guilt if the defendant remains silent in the face of an accusation of
> criminal conduct. [Citation.] When an incriminating statement is made in the presence

and hearing of an accused and the statement is not denied, contradicted, or objected to, both the statement and the failure to deny it are admissible at trial as evidence of the accused's acquiescence in its truth. [Citation.] For the statement to be admitted, the following elements must be met: (1) the defendant heard the accusative statement, (2) the defendant had an opportunity to reply and remained silent, and (3) the accusation was such that the natural reaction of an innocent person would be to deny it. [Citation.] The statement does not need to be made in an accusatory tone as long as it is evident that the defendant 'was being painted or portrayed as a participant in illegal and prohibited activity.' [Citation.] Further, '[a]cquiescence or assent may be manifested by silence or by an evasive, equivocal, or unresponsive reply.' [Citation.]

    \*\*\*

    \*\*\* It has been noted that tacit admissions should be 'received with caution.' [Citation.] Concerns with tacit admissions include the ' "inherently ambiguous nature of the inference itself," ' [citation] and that silence could be 'motivated by many factors other than a sense of guilt or lack of an exculpatory story' [Citation], such as 'prior experience or the advice of counsel' [Citation.]." *People v. Ruiz*, 2019 IL App (1st) 152157, ¶¶ 35, 37.

¶ 16 Defendant maintains that it was not shown that denying possession of a weapon would be a natural reaction to Budris's questions, and thus his silence was not a tacit admission. We note that defendant was not completely silent in response to Burdis's inquiries about the gun; when asked, "Is it a gun or not," defendant stated, "I don't have nothing." The State contends that the Budris's questioning about the gun was permissible pursuant to the public safety exception to the *Miranda* doctrine (see *People v. Williams,* 173 Ill. 2 48 (1996)), but does not otherwise explain

why the statements would be admissible at trial, instead noting that defendant has forfeited his tacit admission claim where he did not object to the evidence at trial or raise the issue in his posttrial motion. It is well-established that both steps must be taken to preserve an error for appellate review. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Nonetheless, defendant seeks review under the plain-error rule, claiming that both prongs of plain error support review.

¶ 17 Although courts typically begin plain-error analysis by asking whether an error occurred at all, that step is not necessary when it is clear that defendant cannot satisfy either prong. See *People v. Scott*, 2015 IL App (4th) 130222, ¶¶ 32-33. Assuming *arguendo* that an error occurred, it is clear that defendant cannot establish that the evidence was closely balanced under the first prong or that a serious error occurred under the second prong.

¶ 18 Our supreme court has described the plain-error rule as follows:

"[T]he plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence. In the first instance, the defendant must prove 'prejudicial error.' That is, the defendant must show both that there was plain error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. *** In the second instance, the defendant must prove there was plain error and that the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. [Citation.] Prejudice to the defendant is presumed because of the importance of the right involved, '*regardless* of the strength of the evidence.' (Emphasis in original.) [Citation.] In both instances, the burden of persuasion remains with the defendant. [Citations.]." *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005).

¶ 19　In support of finding first-prong plain error, defendant directs us to *People v. Nolan*, 152 Ill. App. 3d 260 (1987), which found improperly admitted tacit-admission evidence to be plain error because the evidence was closely balanced, with the issue in dispute being the defendant's intent. *Nolan* does not avail defendant because here the evidence was not closely balanced. Magpali testified that, as he was chasing defendant, he saw defendant throw a black object. More significantly, Smith testified that he saw defendant throw a black pistol and shined his light on the pistol as he chased defendant. Officers Klein and Reyes located a handgun in exactly the area where Smith had seen it thrown. Furthermore, the gun was dry, clean, and free of debris or rust, suggesting that it had not been at that location for very long. Defendant posits that Smith's testimony might have been unreliable because his perception that the object defendant threw was a gun could have been shaped by the fact that a gun was what the other officers recovered. While this suggestion is arguably belied by Smith's testimony that he shined his flashlight on the gun as he continued to chase defendant, we cannot otherwise say that that possibility renders the evidence closely balanced; it is the province of the jury to determine the credibility of witnesses and what weight to give their testimony. *People v. Fountain*, 2011 IL App (1st) 083459-B, ¶ 13.

¶ 20　Nor is the second prong of the plain-error doctrine satisfied. Review under the second prong is typically limited to errors that are so serious as to amount to structural errors. *People v. Thompson*, 238 Ill. 2d 598, 608 (2010); *People v. Bailey*, 2020 IL App (5th) 160458, ¶ 79. A structural error is "a *systemic* error which serves to 'erode the integrity of the judicial process and undermine the fairness of the defendant's trial.' " (Emphasis added.) *People v. Glasper*, 234 Ill. 2d 173, 197-98 (2009) (quoting *People v. Herron*, 215 Ill. 2d 167, 186 (2005)). Structural error has been recognized in a limited class of cases. *Bailey*, 2020 IL App (5th) 160458, ¶ 79. "Those cases include a complete denial of counsel, trial before a biased judge, racial discrimination in the

selection of a grand jury, denial of self-representation at trial, denial of a public trial, and a defective reasonable doubt instruction." *Thompson*, 238 Ill. 2d at 609. While there is Illinois authority that the list of structural errors identified in *Thompson* is not exhaustive (*People v. Clark*, 2014 IL App (1st) 123494, ¶¶ 38-39), other errors subject to plain-error review must be of similar gravity. The error alleged here does not qualify. Assuming *arguendo* that the tacit-admission evidence here was improper, such would not be a systemic error or of a similar character to the types of errors that have been deemed so serious as to be structural error.

¶ 21    Defendant next argues that counsel's failure to preserve the issue for review deprived him of the effective assistance of counsel. We disagree. To establish ineffective assistance of counsel, a criminal defendant must show that counsel's performance "fell below an objective standard of reasonableness" and that the deficient performance was prejudicial in that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). Given the strength of the State's evidence, as discussed above, there is not a reasonable probability that defendant would have been acquitted had the challenged evidence not been admitted. Because defendant has not established prejudice, he cannot prevail on his claim of ineffective assistance of counsel and we need not consider whether his performance was deficient. See *People v. Guerra*, 2020 IL App (1st) 171727, ¶ 25.

¶ 22    Defendant next contends that the trial court erred by sustaining the State's objections to comments during closing argument about the statements Budris made about taking the billy club or baton found in Ruiz's vehicle. Defendant complains that he "was cut off while attacking [Budris's] credibility *** and raising the inference that [Budris] planted the weapon in question."

¶ 23   It is well established that " '[a] criminal defendant's right to make a closing summation before the finder of fact is a fundamental right derived from the sixth amendment guarantee of assistance of counsel.' " *People v. Ramos*, 2018 IL App (1st) 151888, ¶ 27 (quoting *People v. Stevens*, 338 Ill. App. 3d 806, 810 (2003)).  Nonetheless, "the trial court retains great latitude in limiting the scope of that argument." *People v. Carr-McKnight*, 2020 IL App (1st) 163245, ¶ 105.  Rulings limiting the defendant's closing argument are reviewed under the abuse-of-discretion standard. *Id.*

¶ 24   The relevant portion of the closing argument follows:

"MR. CONROE [(DEFENSE COUNSEL)]: *** You saw how [Budris] acted on duty as the evidence technician.  He took a piece of property that he wanted from [Ruiz's] car, and he let his fellow officers know that he intended to keep it.  And excuse my language; but he said, I am going to just fucking take this.

MR. DYSON [(ASSISTANT STATE'S ATTORNEY)]: Objection, Judge.

THE COURT: Sustained.

The jury will disregard that.

MR. CONROE: He came in here and he called what he was saying a joke.  And I, of course, understand and concede that police officers have a difficult job, and it's okay for them to joke.  But, first of all, this wasn't a joke.  *** [T]his joke was about planting or stealing evidence in this case.

MR. DYSON: Objection.

THE COURT: Sustained.

The jury will disregard that remark as well."

¶ 25 The trial court did not abuse its discretion in sustaining the objection to counsel's comment that Budris joked about planting evidence. Budris said nothing whatsoever, implicitly or explicitly, about planting evidence. Nor was there any other evidence to support a defense theory that Budris planted the gun. The trial court did not abuse its discretion in refusing to permit defendant to pursue that line of argument.

¶ 26 In contrast, the remarks about how Budris "acted on duty" and about him joking about stealing the baton were fair comments on the evidence and were at least arguably germane to Budris's credibility. We note, however, that defendant was permitted to make related arguments attacking Budris's credibility. Defense counsel noted that Budris testified that he took the baton into evidence because it was a weapon that should not be left unsecured. Defense counsel observed, however, that the baton could have simply been locked in the Honda. Defense counsel asked the jury how it could have any faith in Budris's work as an evidence technician given his conduct.

¶ 27 Moreover, we are persuaded that even if the objected-to arguments calling into question Budris's credibility had been allowed, the jury's verdict would have been no different. See *People v. Carr-McKnight*, 2020 IL App (1st) 163245, ¶ 107 (abuse of discretion in restricting a defendant's closing argument is subject to harmless-error analysis). There is no question that defendant threw some object during his encounter with the police. Smith testified that he observed the object to be a pistol when he shined his light on the object while continuing to chase defendant. And a pistol was, indeed, found at the portion of the fence line where Smith saw the object thrown. The critical question was whether that pistol was the object that defendant threw. If so, the State proved its case. Budris's testimony had no bearing on the connection between the object Smith saw defendant throw and the pistol that Klein and Reyes found at the location Smith saw defendant

throw it. Burdis merely took the pistol into evidence and arranged to have the same processed, which we parenthetically note failed to yield any fingerprint or DNA evidence. Simply put, defendant's conviction was not materially dependent on Budris's credibility. Any error in restricting defendant's ability to comment on Budris's conduct was harmless beyond a reasonable doubt.

¶ 28                                    III. CONCLUSION

¶ 29    For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

¶ 30    Affirmed.