2020 IL App (2d) 180148
No. 2-18-0148
Opinion filed September 10, 2020

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-19 |
| SHAUNTAINE D. CURRY, | ) ) | Honorable James S. Cowlin, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court, with opinion.
Justices Jorgensen and Bridges concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Shauntaine D. Curry, appeals from the judgment of the circuit court of McHenry County, finding him guilty of one count of criminal sexual assault (720 ILCS 5/11-1.20(a)(2) (West 2016)). Defendant contends that (1) he was denied his statutory right to a speedy trial (725 ILCS 5/103-5(a) (West 2016)) and (2) the trial court abused its discretion in admitting Facebook records as self-authenticating business records. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3    On July 26, 2016, defendant was charged with one count of criminal sexual assault (720 ILCS 5/11-1.20(a)(2) (West 2016)), based upon an incident that occurred on the previous day.

Defendant was taken into custody on July 25, 2016, and remained so through his trial and sentencing.

¶ 4    Regarding defendant's statutory speedy-trial claim, the pleadings and hearing on the State's motion for a trial continuance to obtain DNA results under section 103-5(c) the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/103-5(c) (West 2016)) disclosed the following. On August 1, 2016, the Harvard Police Department provided evidence—namely, a sexual-assault-evidence-collection kit (kit)—to the Illinois State Police crime lab (lab) for processing. On May 8, 2017, the defendant demanded trial; the court set a trial date of July 17, 2017. Shortly after that, the State learned that (1) the kit was unprocessed due to an approximately 12-month backlog, (2) analysis priority is determined by trial date, and (3) the lab would need an exemplar from defendant to conduct a DNA comparison.

¶ 5    On May 22, 2017, the State filed a motion for exemplars from the defendant. On May 25, 2017, the lab reported that semen recovered from the kit was suitable for DNA analysis. Over defendant's objection, on May 30, 2017, the court ordered him to provide exemplars. That day, the lab informed the State that (1) after exemplar receipt, it needed 90 days to conduct a kit DNA comparison, and (2) the comparison might consume the biological evidence. The State forwarded defendant's exemplars to the lab on June 1, 2017. On June 5, 2017, the State filed a motion to permit consumptive testing and to continue the trial date to allow time for DNA testing under section 103-5(c). The court continued the hearing to June 14, 2017.

¶ 6    After the June 14, 2017, hearing, and over defendant's objections, the court entered an order allowing consumptive testing, striking the July 17, 2017, trial date, and granting the State's motion to continue the trial under section 103-5(c). In so ordering, the court noted that lab "pecking order" caused samples from other cases with a status of set-for-trial to move up in the queue. The

court found that, considering the testing backlog, the State had exercised due diligence by "doing what [it could] to try to get this case moving along." The court rescheduled the trial for October 2, 2017. But for the continuance under section 103-5(c), defendant would have been brought to trial within the 120-day statutory period. Defendant filed a motion to dismiss based on a violation of his statutory speedy-trial right. See *id.* § 103-5(a). Citing its prior finding of the State's due diligence in support of the continuance, the trial court denied defendant's motion.

¶ 7　　Before trial, the State moved *in limine* to admit, as self-authenticating business records, Facebook messages from defendant to the victim. Defendant asserted that the messages were not self-authenticating business records. The State responded that the messages were self-authenticating as to their source, but agreed that they were not so as to their content. The State proffered that the victim would testify as to the content of the messages. The trial court found the Facebook records admissible to show only "where [the messages] came from and where they went to." The message content would require victim authentication "pertaining to [the conversations]."

¶ 8　　At the bench trial, C.G. testified that on July 25, 2016, she lived in Harvard with her mother, T.P., who was a friend of defendant's mother and cousin. Around 7 a.m., C.G. was asleep in her bedroom but awoke because she "felt something poking [her]" in her "lower vaginal area." She saw defendant, whom she described as a family friend, on top of her. His penis was inside her vagina. C.G. immediately got up and ran to the bathroom. As she did, she heard defendant ask if she wanted him to leave. C.G. told defendant that he was not supposed to be there. C.G. was in shock, and the situation felt like a dream. According to C.G., defendant had never been in her bedroom before and did not have permission that night.

¶ 9　　After hearing the back door of the home close, C.G. ran to the basement, where T.P. and her boyfriend were sleeping. C.G. woke T.P., told her about the incident, and called the police.

¶ 10    C.G. had a Facebook account for approximately four years and was a "Facebook friend" with defendant for about two years. Before July 25, 2016, they used their phone Facebook messenger application to communicate. C.G. was familiar with defendant's Facebook messages, because they included his name, Shaun Curry, and his photo. When messaging back and forth, he called her by her nickname, "Lay." They discussed mutually familiar topics. The morning of July 25, 2016, C.G. received Facebook messages from defendant. C.G. identified several Facebook messages as fairly and accurately depicting those she had received from defendant. In the messages, defendant referred to her as Lay.

¶ 11    According to C.G., before the incident, defendant sent her several Facebook messages to which she did not respond because she was asleep. Then, after the incident, around 8:07 a.m., while the police were transporting C.G. to Wisconsin for a sexual-assault examination, defendant sent another message, telling her not to sign a complaint and to say that "it was b***." Defendant added that C.G. would never see him again. Defendant told C.G. that he would never bother her again if she would say that her report was false. C.G. sent defendant several messages asking why he had been in her bed and had pulled down her pants.

¶ 12    At the hospital, C.G. told a police officer that defendant was sending her messages. The officer said that he would call another officer and have him take defendant's phone. After that, C.G. did not receive any messages from defendant.

¶ 13    On cross-examination, C.G. acknowledged that defendant had never before used force with her and that his conduct surprised her. She conceded that, on the morning of the incident, defendant did not threaten her in person or by Facebook message.

¶ 14    Officer Robert Schultz of the Harvard Police Department testified that at about 7:48 a.m. on July 25, 2016, he was dispatched to investigate a woman's report of a strange man in her bed.

The dispatch identified the man as Shaun Curry and included a physical description. As Officer Schultz drove toward the home, he saw defendant, who fit the assailant's description, walking away from the scene quickly.

¶ 15    Officer Schultz exited his squad car, approached defendant, and asked if he was Shaun Curry. Defendant said no, but when the officer requested identification, defendant gave him an ID card and identified himself as Shauntaine Curry. Another officer arrived and said that C.G. had accused defendant of sexually assaulting her. Officer Schultz placed defendant under arrest at approximately 8:07 a.m.

¶ 16    Officer Schultz transported defendant to the police station. The officer allowed defendant to keep his cell phone while in the booking area because arrestees typically need to arrange bail or call friends. At one point, Officer Schultz received a call from a detective advising him that defendant was communicating with the victim by phone. Officer Schultz took possession of defendant's phone.

¶ 17    Janice Counsell-Barker testified that she was a sexual-assault nurse examiner at Mercy Hospital and Trauma Center in Janesville, Wisconsin. Around 10:17 a.m. on July 25, 2016, she examined C.G., who told her that she had been sleeping but awoke to a man penetrating her vagina with his penis. C.G. complained of abdominal pain and some vaginal bleeding. Counsell-Barker examined C.G.'s vagina and saw bright red blood, which she characterized as acute, near her cervix. C.G. also had some notches in her hymen, but none were bleeding. Because C.G. was not menstruating, and the bleeding was abnormal, Counsell-Barker could not rule out sexual assault. Counsell-Barker admitted on cross-examination that her observations could have resulted from consensual sex. On redirect examination, Counsell-Barker added that the absence of visible physical injuries after a sexual assault was not unusual.

¶ 18    Officer Dean Burton of the Harvard Police Department testified that at about 7:50 a.m. on July 25, 2016, he was dispatched to C.G.'s house. He described C.G. as visibly upset and crying upon his arrival. She told Officer Burton that she awoke to find defendant sexually assaulting her. Officer Burton radioed a description of defendant to other officers. At about 8:02 a.m., Officer Schultz notified Officer Burton that he had stopped defendant.

¶ 19    Officer Burton transported C.G. to the hospital in Harvard. At one point, C.G. showed him her phone where he observed several messages from defendant. Officer Burton told C.G. to take screen shots of the messages and save them.

¶ 20    Officer Verle Leard of the Harvard Police Department testified that he met with C.G. at the Harvard hospital. Between 8:30 and 9 a.m. on July 25, 2016, while arrangements were being made to transport C.G. to a Janesville hospital for a sexual-assault examination, C.G. asked if defendant was in custody. When he responded that defendant was in custody, C.G. asked why defendant was still using Facebook to send her messages. Detective Leard observed the messages on C.G.'s phone and radioed Officer Schultz to inquire if defendant was using his phone. When Officer Schultz said that he was, Detective Leard told him to take defendant's phone; messages from defendant to C.G. then stopped. The following day at the police station, Detective Leard asked C.G. to sign into her Facebook account. The July 25, 2016, Facebook messages were still in C.G.'s account. The name on the sender's account was Shaun Curry.

¶ 21    On the next day, July 27, 2016, Detective Leard sent Facebook a request to preserve the messages in defendant's account. On August 1, 2016, Detective Leard obtained a search warrant for C.G.'s and defendant's Facebook accounts and sent the warrant electronically to Facebook. On August 29, 2016, Facebook e-mailed to Detective Leard defendant's account information and the July 25, 2016, messages between defendant and C.G. Detective Leard identified the State's

exhibits as the information he received from Facebook, including the messages between defendant and C.G. Detective Leard also identified a letter from Facebook, authenticating the records the company sent in response to the search warrant. According to Detective Leard, the messages that he observed on C.G.'s phone matched those provided by Facebook. Detective Leard could not examine defendant's phone because the police no longer possessed it.

¶ 22    On cross-examination, Detective Leard acknowledged that Facebook could not authenticate C.G.'s Facebook account, because the account information submitted did not match any Facebook account on file.

¶ 23    The State moved to admit a certificate of authenticity of Facebook's regularly conducted activity and a four-page document created by Facebook containing the content and transmission times of the July 25, 2016, messages recovered from defendant's account. The court admitted the Facebook documents, finding that C.G.'s testimony provided the additional foundation for admission of their content.

¶ 24    Defendant testified on his own behalf. He knew C.G. for over four years and met her family through his cousin. According to defendant, he was welcome at C.G.'s home and had been there numerous times.

¶ 25    During the early morning hours of July 25, 2016, defendant left work and tried unsuccessfully to contact C.G. and her sister, B.W. Defendant arrived home between 2:30 and 3 a.m. Defendant went to sleep but awoke because his mother and her friends were noisy. Defendant argued with his mother and went to Wilson's house. When he could not contact Wilson, he went to C.G.'s home to see T.P.

¶ 26    When defendant arrived, he unsuccessfully tried calling T.P. Defendant then sent C.G. a text message saying he was at the door, but she did not respond. He also called C.G., but she did

not answer. Defendant then tried to open the back door, but it was locked. Defendant discovered the front door was unlocked and walked in. According to defendant, he had entered the home unannounced before.

¶ 27    Defendant walked downstairs to talk to T.P., but she was sleeping. Defendant then went upstairs and entered C.G.'s bedroom. C.G. was asleep and uncovered. Defendant tapped C.G.'s leg, and she awoke. According to defendant, C.G. saw him, sat up, and then laid down under the covers. Defendant put a DVD in the television, sat down on the end of the bed, and watched a movie. As he did, C.G. was laying on the bed next to him. When defendant asked C.G. if he could lay with her, she grunted. Defendant interpreted her response as "yes."

¶ 28    As defendant lay on the bed watching the movie, C.G. scooted back and rubbed her buttocks against his thigh. He interpreted that to mean that she wanted to have sexual intercourse. According to defendant, he then began touching C.G., and she started to moan. Her eyes were open. At one point, he pulled both their pants down and began having sex with C.G. She scooted forward, looked at him for a few seconds, and said that she thought he was someone else. As defendant sat on the bed, C.G. began looking for her phone. C.G. found her phone and went into the bathroom.

¶ 29    Defendant pulled up his pants and watched the movie for another two minutes. He then knocked on the bathroom door and asked C.G. if she wanted him to leave. She said yes, and he left. As he was walking toward his mother's house, the police stopped him.

¶ 30    Defendant admitted that, while he was in custody, he sent messages to C.G. But he denied threatening her or telling her to lie. Defendant explained that he told C.G. that he would leave her alone because he realized that she could not be convinced to tell the truth. According to defendant,

he initially believed that C.G. had made advances toward him but later realized his mistake. He denied forcing C.G. to have sex.

¶ 31    In the State's rebuttal case, T.P. testified that defendant occasionally visited her home, but he was not allowed to come and go as he pleased. He was not allowed to just walk in without notifying T.P., and he would always call first and ask if it was okay to stop by. She denied receiving any calls from defendant or permitting him to be in her home on July 25, 2016. She admitted on cross-examination that, because she was asleep, defendant might have called, and she did not answer.

¶ 32    According to T.P., on the morning of July 25, 2016, C.G. woke her. C.G. was shaking, crying, and scared.

¶ 33    The trial court found defendant guilty. He filed a motion for a new trial, arguing among other things, that (1) it was error to admit the Facebook records as self-authenticating business records and (2) he was denied a statutory speedy trial because he was not tried within 120 days of his trial demand. The court denied defendant's motion for a new trial and sentenced him to 12 years' imprisonment. Following the denial of his motion to reconsider the sentence, he filed a timely notice of appeal.

¶ 34                                  II. ANALYSIS

¶ 35                        A. Speedy-Trial Term—DNA Delay

¶ 36    Defendant first argues that, by finding that the State exercised due diligence in seeking timely DNA test results, the trial court abused its discretion when it granted the State's motion for a continuance because it could not obtain DNA results within the speedy-trial term. The State responds that it exercised due diligence. It is undisputed that if the State exercised due diligence, such that the trial court's extension of the speedy-trial term under section 103-5(c) was proper,

defendant was brought to trial within the speedy trial term. For the following reasons, we reject defendant's argument.

¶ 37    A defendant possesses both constitutional and statutory rights to a speedy trial. See U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; 725 ILCS 5/103-5(a) (West 2016); *People v. Spears*, 395 Ill. App. 3d 889, 892 (2009). While the constitutional and statutory provisions address similar concerns, "the rights established by each of them are not necessarily coextensive." *People v. Kliner*, 185 Ill. 2d 81, 114 (1998). Here, defendant asserts a violation of only his statutory speedy-trial rights.

¶ 38    Section 103-5(a) of the Code requires that a defendant in custody be brought to trial within 120 days from the date taken into custody and does not require that defendant file a trial demand to exercise the right. 725 ILCS 5/103-5(a) (West 2016). Where this term is violated, the defendant must be discharged. *Id.* § 103-5(d). There are two exceptions to this rule. The first, not at issue here, concerns "delay[s] *** occasioned by the defendant," which includes a defendant's express agreement to a continuance. *Id.* § 103-5(a); *Kliner*, 185 Ill. 2d at 114, 115-16 (agreement to continue "constitutes an affirmative act of delay attributable to the defendant"). The second exception applies here, where the State seeks an extension of up to 120 days because it is unable to obtain DNA results, even though exercising due diligence to obtain the same. 725 ILCS 5/103-5(c) (West 2016). Specifically, section 103-5(c) provides that

> "[i]f the court determines that the State has exercised without success due diligence to obtain results of DNA testing that is material to the case and that there are reasonable grounds to believe that such results may be obtained at a later day, the court may continue the cause on application of the State for not more than an additional 120 days." *Id.*

¶ 39    A trial court's ruling on the issue of the State's diligence will not be overturned unless it amounts to a clear abuse of discretion. *Spears*, 395 Ill. App. 3d at 893. A trial court abuses its discretion where its decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the court's view. *Id.* Whether the State exercised due diligence is a question determined on a case-by-case basis after careful review of the circumstances. *Id.* The State bears the burden of proving that it exercised due diligence. *Id.* Whether a trial court abused its discretion when it determined the exercise of due diligence is based on the information before the court when it made its finding. *Id.* Thus, when a defendant challenges a trial court's grant of a continuance under section 103-5(c), we examine the record as it existed at the time of the ruling. *Id.*

¶ 40    The record existing when the court ruled consists of the State's pleading, its attachments, and the representations made during the argument on the motion. Taken together, the trial court had the following information when it granted the State's section 103-5(c) motion. On August 1, 2016, about a week after defendant was taken into custody, the Harvard Police Department provided the kit to the lab for processing. The lab had a 12-month kit-processing backlog, except where a case status is set-for-trial, which would move a kit to the front of the line. On May 8, 2017, defendant demanded trial, and the trial court set a trial date of July 17, 2017. Shortly thereafter, the State spoke to the lab and learned that the kit submitted in August of 2016 was unprocessed due to the backlog. The lab further informed the State that (1) requests are prioritized to support a case status of set-for-trial and (2) the lab would need an exemplar from defendant to conduct DNA analysis.

¶ 41    On May 22, 2017, the State filed a motion for exemplars from defendant. On May 25, 2017, the lab issued a report indicating that semen had been recovered from the kit and was suitable for DNA analysis. On May 30, 2017, the trial court ordered defendant to provide exemplars over his

objection. On that same date, the lab informed the State that it would need 90 days from the date it received the exemplars to conduct a DNA comparison with the semen from the kit and, further, that the comparison might consume the biological evidence. On June 1, 2017, the exemplars were obtained from defendant and forwarded to the lab. On June 5, 2017, the State filed a motion to permit consumptive testing and to continue the trial date to complete DNA testing under section 103-5(c). After a hearing on June 14, 2017, the court granted both motions.

¶ 42     In granting the State's section 103-5(c) continuance, the trial court noted that "a pecking order" at the lab caused samples for cases set-for-trial to move ahead of this case in the queue. It considered the testing backlog and found that the State had exercised due diligence by "doing what [it could] to try to get this case moving along." The court rescheduled the trial for October 2, 2017.

¶ 43     On appeal, defendant argues, as he did in the trial court, that the State's due diligence amounted to nothing more than submitting the kit to the lab. The State then essentially ignored the potential DNA evidence and defendant's speedy-trial rights until 10 months later when his case status changed to set-for-trial. Nor did the State take any steps to obtain defendant's exemplars for comparison purposes during these 10 months. In short, defendant contends that the State should have done more between submitting C.G.'s kit in August 2016 and the setting of the trial date on May 8, 2017. For instance, the State could have obtained defendant's DNA sample and periodically inquired about the status of the testing on C.G.'s kit. Defendant notes that "[w]hatever 'due diligence' means, it cannot be defined as ignoring or doing nothing about a statutory requirement." *People v. Exson*, 384 Ill. App. 3d 794, 800 (2008). Further, there should have been an "overt act *** to impress upon and explain to the crime lab that the report should be expedited." *People v. Durham*, 193 Ill. App. 3d 545, 546 (1990).

¶ 44    Certainly, the "provision for DNA testing was not meant to provide an automatic continuance in every trial that involve[s] DNA testing." *People v. Colson*, 339 Ill. App. 3d 1039, 1048 (2003). Defendant refers us, *inter alia*, to the Fifth District's three-part due diligence test established in *People v. Battles*, 311 Ill. App. 3d 991, 998 (2000), in support of his contention that the State did not exercise due diligence. We, however, disavowed the *Battles* test in *Spears*, 395 Ill. App. 3d at 895, though we conceded its factors might often be relevant to a due diligence inquiry. See also *Colson*, 339 Ill. App. 3d at 1048 (Fourth District declines to adopt *Battles* test). Instead, we employ a case-by-case analysis to determine whether the State has exercised due diligence in obtaining DNA testing. *Spears*, 395 Ill. App. 3d at 895. Thus, while we have reviewed the various cases cited by defendant in support of his position, we ultimately decide whether the trial court abused its discretion by considering the unique facts known to the court at the time it granted the section 103-5(c) continuance. *Id.* at 893.

¶ 45    Considering that the lab was operating with a one-year backlog for DNA analysis, it is pure speculation on defendant's part that repeated prodding by the State might have hastened the lab's analysis. Nor would providing defendant's exemplar have hastened the analysis. Per the lab, a case can be moved to the front of the analysis line only when its status is set-for-trial.

¶ 46    Though defendant had been in custody for approximately 10 months, on May 8, 2017, when the case status changed to set-for-trial, the speedy term was then at about day 58. When the case status changed to set-for-trial, the State reached out to the lab and learned that the preliminary kit analysis was unfinished. The lab also informed the State it would need an exemplar from defendant for DNA analysis. Before issuing the May 25, 2017, lab report, the lab told the State that semen was detected. The State filed a motion to obtain defendant's exemplar on May 22, 2017, which the court granted over the State's objection on May 30, 2017. On June 1, 2017, law

enforcement obtained the exemplars from defendant and provided them to the lab. Also, on May 30, 2017, the lab informed the State that it would need 90 days to complete the DNA analysis comparing the semen from the kit to defendant's exemplar. This delay, combined with the lab report's indication that comparative analysis would possibly consume the evidence from the kit, caused the State to file on June 5, 2017, a motion to permit consumptive testing and for a continuance under section 103-5(c).

¶ 47　　The above facts were known to the trial court when it granted the State's section 103-5(c) motion for a continuance. In that light, unlike in *Battles*, the State was found diligent in attempting to obtain the DNA testing. It did not merely seek to escape a speedy-trial-term discharge due to its dilatoriness. Accordingly, the trial court did not abuse its discretion in granting the continuance based upon its findings that the State exercised due diligence in attempting to obtain material DNA testing.

¶ 48　　　　　　　　　　　B. Facebook Evidence

¶ 49　　Defendant next argues that the trial court improperly granted the State's motion *in limine* and admitted Facebook records, purportedly related to defendant, as self-authenticating documents under Illinois Rule of Evidence 902(11) (eff. Jan. 1, 2011). Specifically, defendant characterizes the trial court's complained-of rulings as admitting the content of the messages under Rule 902(11), and he argues that the message content is not properly a business record, citing, *inter alia*, *United States v. Browne*, 834 F.3d 403, 408-11 (3rd Cir. 2016). We note initially, however, that the record belies defendant's characterization of the trial court's ruling. The trial court's written ruling on the Facebook motion *in limine* specifically provides:

"[I]t is hereby ordered that the Facebook records related to the account, including subscriber information, name, address, telephone numbers, email addresses and anything

else related to the account are admissible pursuant to SC Rule 803(6) and 902(11) as self-authenticating documents; *the content of any Facebook messages are not admissible pursuant to this rule unless there is further foundation as to the content of the messages; should the State lay the proper foundation/authentication through other witnesses, the content shall be admissible."* (Emphasis added).

Further, how the evidence was admitted at trial was consistent with the *in limine* ruling. Specifically, the trial court allowed the content of the Facebook records only after it considered the additional authenticity testimony from C.G. Accordingly, we address the admissibility of the Facebook records as admitted, and not as portrayed by defendant.

¶ 50    It is within the trial court's discretion to admit evidence, and we will not reverse such a ruling absent an abuse of that discretion. *People v. Becker*, 239 Ill. 2d 215, 234 (2010). An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would agree with the trial court's position. *Id.*

¶ 51    We begin with the trial court's ruling that the subscriber's name, address, telephone number, and e-mail address were admissible as self-authenticating business records. A business record is admissible hearsay if its proponent establishes (1) that the record was made as a memorandum or record of the act, (2) that the record was made in the regular course of business, and (3) that it was the regular practice of the business to make such a record at or near the time of the act. Ill. R. Evid. 803(6) (eff. Apr. 26, 2012); see also *People v. Ramos*, 2018 IL App (1st) 151888, ¶ 22. Further, some business records are self-authenticating. Ill. R. Evid. 902(11) (eff. Jan. 1, (2011). However, to be self-authenticating, a business record must be accompanied by a certification from the record's custodian or other qualified person attesting to the foundational requirements for admission of a business record. Ill. R. Evid. 902(11) (eff. Jan. 1, 2011); see also

*Ramos*, 2018 IL App (1st) 151888, ¶ 23. Accordingly, self-authenticating business records do not require trial testimony. *People v. Crump*, 2018 IL App (3d) 160124, ¶ 19.

¶ 52    Here, the State submitted the written certification of a qualified person from Facebook. The certification provided that the records were made and kept by Facebook in the course of its regularly conducted activity and as part of its regular business practice. As the trial court found, that was sufficient to admit the information regarding defendant's name, address, telephone number, and e-mail address, as indicated on the Facebook account, as self-authenticating business records. Thus, the trial court did not abuse its discretion in admitting that information as a self-authenticating business record.

¶ 53    We turn next to defendant's contention that the trial court abused its discretion in admitting the content of the Facebook messages because there was insufficient authentication.

¶ 54    Contending that the court abused its discretion in admitting the content of the Facebook messages, defendant relies substantially upon *People v. Kent*, 2017 IL App (2d) 140917. The defendant in *Kent* was convicted of the first-degree murder of a victim who had been shot in his own driveway. *Id.* ¶¶ 3, 4. On appeal, Kent argued that the trial court abused its discretion in admitting into evidence a Facebook profile under a nickname associated with Kent, "Lorenzo Luckii Santos" that contained a photograph of a person resembling him. *Id.* ¶ 57. The Santos profile further contained a post reading " 'its my way or the highway…..leave em dead n his driveway.' " *Id.* The State introduced no direct or circumstantial proof of authentication, Kent did not admit creating the Facebook profile or authoring the post, and there was no testimony suggesting that Kent was affiliated with the creation of either. *Id.* ¶ 119. Considering the ease in fabricating a social media account, the *Kent* court found that the Facebook post was improperly

admitted, because the only evidence of authentication was the defendant's nickname and a photograph allegedly resembling Kent. *Id.*

¶ 55 Defendant's reliance on *Kent*, however, is of no avail, given the substantial and circumstantial evidence connecting the instant messages to defendant. Facebook messages are akin to e-mails or text messages. An e-mail may be authenticated through circumstantial evidence. *People v. Diomedes*, 2014 IL App (2d) 121080, ¶ 18. A text message similarly may be authenticated through circumstantial evidence. *People v. Walker*, 2016 IL (2d) 140566, ¶ 12; see also Ill. R. Evid. 901(b)(4) (eff. Jan. 1, 2011) (where a document's contents, in conjunction with other circumstances, reflect distinctive characteristics, the authentication requirement may be deemed satisfied); see also *Browne*, 834 F.3d at 412 (proper to consider a wide range of extrinsic evidence for the authentication of social media records). Thus, we may consider circumstantial evidence, as did the trial court, in deciding whether the contents of the Facebook messages were properly authenticated.

¶ 56 Circumstantial evidence of authentication includes such factors as appearance, context, substance, and distinctive characteristics, which are to be considered with the surrounding circumstances. *People v. Brand*, 2020 IL App (1st) 171728, ¶ 24. A document may be authenticated by its content if it contains information that would be known only by its purported author. *Id.*; see also Ill. R. Evid. 901(a) (eff. Jan. 1, 2011) (authenticity, as a precondition to admissibility, is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims).

¶ 57 Here, the content of the Facebook messages was properly authenticated by circumstantial evidence showing that defendant was the author. The messages contained information that only defendant would have known. The Facebook messages used defendant's nickname for C.G. The

messages also indicated that their author had personal knowledge of the incident. Starting approximately 20 minutes after the 911 call reporting the assault, and almost immediately after defendant was arrested, the sender urged C.G. not to sign a complaint and to recant her police report. In exchange for her concealment of the assault, the sender promised not to bother C.G. again. Thus, the messages showed that the sender (1) personally knew C.G. and her family, (2) had personal knowledge of the incident, and (3) knew that she had reported it to the police. Because so little time had elapsed since the incident, not to mention defendant's arrest, the sender's knowledge of the assault details was unlikely to have been gleaned from some other source.

¶ 58 Further, the message sender responded to C.G. in a manner indicating that defendant was the author. When C.G. asked him why he had been in her bed and had pulled down her pants, the sender did not ask C.G. what she was talking about or express his innocence. Instead, he conversed in a way that indicated that he was aware of the assault, including trying to persuade C.G. to lie to the police. Further, when Officer Schultz took defendant's phone from him at the police department, C.G. received no more messages, strongly suggesting that defendant was the author of the Facebook messages.

¶ 59 Based on the preceding circumstantial evidence suggesting that defendant authored the Facebook messages, we find them properly authenticated. Thus, the trial court did not abuse its discretion in admitting the content of the Facebook messages.

¶ 60                                III. CONCLUSION

¶ 61 For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 62 Affirmed.

---

**No. 2-18-0148**

---

| | |
|---|---|
| **Cite as:** | *People v. Curry*, 2020 IL App (2d) 180148 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of McHenry County, No. 16-CF-19; the Hon. James S. Cowlin, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Lawrence S. Fischer, of State Appellate Defender's Office, of Elgin, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Patrick D. Kenneally, State's Attorney, of Woodstock (Patrick Delfino, Edward R. Psenicka, and Ivan O. Taylor Jr., of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

---