2022 IL App (2d) 191111
No. 2-19-1111
Opinion filed April 26, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 19-CF-399 |
| JEFFREY J. HAUCK, | ) ) ) | Honorable Robert A. Wilbrandt Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE BRIDGES delivered the judgment of the court, with opinion.
Justices Zenoff and Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Jeffrey J. Hauck, appeals a judgment entered in the McHenry County circuit court finding him guilty of one count of drug induced homicide (720 ILCS 5/9-3.3(a) (West 2018)) and two counts of delivery of a controlled substance (720 ILCS 570/401(d) (West 2018)). The convictions were a result of the death of defendant's girlfriend, Stephanie Phillippi, from an overdose of heroin and fentanyl. Defendant argues that the trial court erred when it admitted phone records from Phillippi's cell phone into evidence. Defendant maintains that the certification for the phone records presented by the State did not satisfy the requirement of Illinois Rule of Evidence 902(11) (eff. Sept. 28, 2018) that the certification be made under oath subject to the penalty of perjury and that the State did not otherwise establish the necessary foundation under Illinois Rule

of Evidence 803(6) (eff. Sept. 28, 2018) for the admission of the phone records under the business record exception to hearsay. For the reasons that follow, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3     Phillippi was found dead in her bedroom during the early hours of March 6, 2019. The cause of her death was determined to have been an overdose of heroin and fentanyl. On June 27, 2019, defendant and his friends Kane Kellett and Melissa R. Ohlson were each indicted on three counts of drug induced homicide and two counts of unlawful delivery of a controlled substance.

¶ 4     On August 28, 2019, the State filed a motion *in limine* seeking to admit, as self-authenticating business records pursuant to Rule 902(11), Phillippi's cell phone records obtained from Verizon pursuant to a subpoena. With the motion, the State submitted a certification from Andrew M. Connors, the custodian of records for Verizon. The certification indicated that it was executed in Bedminster, New Jersey, and stated as follows:

"I, Andrew M. Connors, being duly sworn, depose and say:

1. I am the custodian of records for Verizon, and in that capacity, I certify that the attached 19 Electronic file(s) of records are true and accurate copies of the records created from the information maintained by Verizon in the actual course of business[.]

2. It is Verizon's ordinary practice to maintain such records, and that said records were made contemporaneously with the transaction and events stated therein, or within a reasonable time thereafter.

/s/ Andrew M. Connors"

¶ 5        A hearing on the motion *in limine* was held on August 30, 2019. At the hearing, defendant objected to the admission of the Verizon records, arguing as follows:

> "My objection to people's motion number three—or the defendant's objection to people's number three is the form and content of Exhibit No. 1, which is the Verizon certification.
>
> "It appears—it purports to be an electronic signature. And there's nothing in terms of a—a notary or a guarantor or a—any type of signatory confirmation that Andrew Connors—this appears to be just a form that was generated on his computer.
>
> So we would be objecting to the form of the certification tendered by Verizon."

Over defendant's objection, the trial court granted the State's motion to admit the Verizon records, stating:

> "The issue is, is this a written declaration under oath subject to penalties of perjury.
>
> Now, it isn't notarized. But the issue is, is this sufficient. Andrew M. Connors being duly sworn deposes and says. I would say it is.
>
> Therefore, people's motion *in limine* number three is allowed."

¶ 6        A three-day bench trial was held over the course of September 16 through September 18, 2019. Ohlson testified as follows. She was a heroin addict, and she and defendant became friends after meeting in drug court around 2015. She was charged with drug induced homicide related to Phillippi's death. In exchange for her truthful testimony, the State's Attorney's office was willing to give her consideration in the form of probation or drug court.

¶ 7        At around 6 or 6:30 a.m. on March 5, 2019, defendant called Ohlson to arrange to go to Chicago to purchase drugs. She picked defendant up at the Burger King near his home, and he told her that he needed to go to Phillippi's home to get some money. She was irritated because she

thought they would have to split the drugs three ways, but defendant claimed that none of the drugs were for Phillippi. She drove to Phillippi's house with defendant and waited in the car while he went to Phillippi's window. Phillippi threw him a pill bottle containing $60, and then Ohlson and defendant left for Chicago. When they arrived, she first purchased crack from her dealer, who was named Tree. She smoked the crack and then parked at a gas station. She gave defendant $40, and defendant left to purchase heroin from a man named Glow. A bag of heroin cost $10, but defendant received two extra bags because he had spent $100, so defendant returned with a total of 12 bags. Defendant had owed Ohlson $30, which meant that, with the $40 she had given him, her share was seven bags, with defendant keeping five. The bags from Glow were either green or blue. They then returned to Crystal Lake, where she dropped defendant off at the Burger King. On the way, she snorted two bags of heroin, and defendant used one or two.

¶ 8    Kellett testified as follows. He had been charged with drug induced homicide related to Phillippi's death. He also had pending charges of threatening a public official and possession of a controlled substance in McHenry County and three pending charges of possession of methamphetamine with intent to deliver in Cook County. He had previously been convicted of felony home invasion and a misdemeanor charge of obstructing justice. He had been offered consideration for his testimony, but no formal offer had been extended.

¶ 9    Kellett had known defendant for half of his life and considered him a friend. He had been friends with Phillippi for about three years. Phillippi had cystic fibrosis and had been "crippled" since the previous summer. In March 2019, Kellett had been living at the apartment of Kristi Hauck, defendant's mother, with defendant and defendant's sister.

¶ 10    On March 4, 2019, Kellett, Phillippi, and defendant had gone to Chicago to purchase heroin. Kellett overdosed, was treated at the hospital, and returned to Kristi's apartment afterward.

¶ 11    On the morning of March 5, 2019, he was sleeping. He was aware that defendant left the apartment that morning but did not see him leave, as he was asleep. Sometime in the morning, he awoke and sat up. Defendant dropped into his lap a green bag that contained a powder heroin-fentanyl mix and told him "Don't do it all." Kellett then proceeded to consume a small amount of the powder, "hardly any of it," leaving most of it remaining. Afterward, Phillippi called him, saying that it was her bag and that Kellett had not paid for it. He agreed to take the bag to her, and he told defendant that he was going to take her the bag. He did not recall defendant being in the living room while he was speaking with Phillippi and thought defendant may have been in the bathroom speaking with Kristi. Kellett left the apartment and walked to Phillippi's house. He was texting her on the way, and she was demanding that he bring her all of her bags.

¶ 12    Kellett was shown the pages of the Verizon phone records that contained his conversation with Phillippi, and he identified his phone number on the messages and confirmed that the record accurately reflected their conversation. He eventually arrived at Phillippi's home, where she spoke to him from her window. She dropped a pill bottle down, and he placed the green bag inside of it and threw it back up to her. He then left to catch the train to Woodstock to meet a friend. He did not return to Kristi's apartment until later that night. The next morning, police came to the apartment, but he did not speak to them.

¶ 13    After the police left, defendant showed Kellett a photograph he had received in a text message from Phillippi. The photo depicted the green bag he had brought to Phillippi, and he recalled seeing that Phillippi referred to it as poison in the text message conversation. At trial, Kellett was shown a photograph of a hand holding a small green transparent bag containing a white powder. He identified the photograph as the one he had seen on defendant's phone.

¶ 14    Defense counsel asked Kellett if it was true that on March 5, 2019, defendant had passed out on the stairs leading to the apartment door before returning home, and that he and defendant's mother went to help defendant into the apartment. Kellett acknowledged that defendant had passed out on the stairs and that he had helped defendant into the apartment, but he repeatedly stated, "I didn't know that that was that day."

¶ 15    Kristi testified as follows. On March 5, 2019, she was at her apartment and awoke around 7:30 or 8 a.m. to take her dog out. She had heard defendant in the apartment that morning, but he was not there when she got up. She did not see defendant until a neighbor knocked on her door to tell her that there was a person passed out at the bottom of the stairs and to ask if she knew who it was. She saw that it was her son and ran to her room to retrieve Narcan. Kellett was in the front room, and she told him to help her get defendant into the apartment. She administered the Narcan, and defendant woke up but was not fully responsive. She and Kellett each grabbed one of defendant's shoulders and helped him into the apartment and sat him on the couch. She then went to the kitchen to get defendant some cold compresses. Defendant was slumped over, and Kristi could tell that he was still being affected by drugs. She could see her son the whole time she was getting the cold compresses but lost track of where Kellett went. She did not see Kellett interact with defendant. After about 10 minutes, she helped defendant to her bedroom in order to make him more comfortable. Despite his condition, she did not call 911. She stayed there tending to him until Phillippi arrived sometime around 5 p.m., at which point she realized Kellett had left.

¶ 16    Phillippi knocked on the door, and Kristi answered it but did not let her in. Phillippi wanted to see defendant, but Kristi would not allow her to do so. Phillippi then continued to pound loudly at the door, at which point Kristi threatened to call the police. She did not actually call the police

but did call Phillippi's roommate, William John Roetling, to come and get her. Phillippi was at the door for about 15 to 20 minutes before she left.

¶ 17    On March 6, 2019, Detective David Eitel came to the apartment to speak with Kristi and defendant. She did not inform the detective that her son had overdosed the day before. She did eventually disclose this to him on April 16, 2019.

¶ 18    Roetling testified as follows. He was a retired engineer and had lived at his home in Crystal Lake for 14 years. He had met Phillippi about 13 years prior when she was working at the Public House restaurant. About three years prior to her death, Phillippi moved in with him. She had her own bedroom and bathroom on the second floor and mostly stayed in her room, sometimes eating in the kitchen. Phillippi had lost her driver's license some years previously, and he drove her where she needed to go. He knew most of Phillippi's friends, including defendant, but he did not allow her friends in the house, as prior to living with him she had allowed seven men to live in her apartment without contributing to the rent or upkeep of the space, and he did not want to have that situation in his home. Phillippi was not employed at the time of her death, and he was aware that she used illegal drugs but never saw her use them. He had seen her under the influence of drugs on four or five occasions.

¶ 19    On March 5, 2019, at around 4:15 p.m. Roetling drove Phillippi to Kristi's apartment. Phillippi told him that she had loaned something to defendant and wanted to get it back. He dropped her off at the apartment, and, after waiting 5 or 10 minutes, he went home and texted her to call him when she needed to be picked up. After about half an hour, Kristi called him saying he needed to come and get Phillippi. He then left to get Phillippi, who called him as he was on his way asking him to get her. He picked her up and they returned home. At that time, he did not observe her to be under the influence of drugs. When they got home, Phillippi went to her room

and he went to the kitchen/family room to watch television. At around 8 p.m., Phillippi called down from her room saying that she wanted to order sushi for dinner. He did not see her at that point but spoke with her from the bottom of the stairs. She ordered the sushi for delivery and, when it arrived, he called up to her, to which she responded, "okay." He laid the sushi out on the dining room table, ate his dinner, repackaged the remaining sushi, and put it in the refrigerator before going up to bed around 9:30 p.m. Phillippi had not come down for dinner and he told her that he had put the sushi in the refrigerator, and she responded, "okay."

¶ 20    He awoke early the next morning around 3:30 a.m. He washed, got dressed, and went to go downstairs when he noticed that Phillippi's light was on. He went to check on her, knocking on her door and receiving no response. He opened the door and discovered her sitting slumped over in bed. She had a hypodermic needle in her left hand and had another sticking out of her right arm. He went to check for a pulse and called 911. He then went downstairs to leave the front door open for the first responders and returned to administer CPR to Phillippi until the first responders arrived.

¶ 21    Police arrived at the home and attempted to revive Phillippi by administering Narcan and performing CPR, to no effect. Several items of drug paraphernalia were found in Phillippi's room. A small green transparent bag was found on her bed. A small transparent bag with a piece of folded tin foil was found on the floor near her bed. In addition to the uncapped syringe found in Phillippi's arm, two capped syringes were found on her bed, as well as a clear plastic bag containing more syringes. Also found on the bed was a hot pad, lighter, spoon with burn marks, and burnt pieces of tissue or paper towel. Police also located syringes in a garbage can. A floral box was found open on top of a small refrigerator, and it contained more paraphernalia, including used syringes and several small bags, two of which were transparent blue, the rest of which were transparent with a

pattern printed on them. Located in a carrying pouch on Phillippi's walker was an empty pill bottle, a blue smoking pipe, and some syringe caps. Underneath the bed, officers found a clear plastic bin containing several prescription pill bottles prescribed to Phillippi and other medical items. Police also recovered Phillippi's cell phone from her bed.

¶ 22    The transparent green bag and the clear bag with the foil in it were sent for testing at the Illinois State Police crime lab. Residue from the green bag was tested and determined to contain a mix of heroin and fentanyl. Per the lab's policy, the clear bag was not tested, as drug residue had already been identified in the green bag.

¶ 23    At around 7 a.m. on March 6, 2019, Detective Eitel spoke with defendant and Kristi at her apartment. He learned Phillippi's phone number from defendant. Eitel then determined that the number was serviced by Verizon, and he sent a preservation request to Verizon. Ultimately Eitel obtained and executed a search warrant for Phillippi's phone records. He then received the records along with the certification from Connors. The records contained transcripts of text messages, which appeared in "no apparent order." Eitel performed a search for messages between Phillippi and the phone numbers associated with defendant and Kellett. He then copied and pasted those messages in chronological order into two separate documents, one for the messages between Phillippi and defendant and one for the messages between Phillippi and Kellett. These documents were admitted as demonstrative exhibits.

¶ 24    The pertinent messages between Phillippi and Kellett reflect the text conversation Kellett testified to having with Phillippi on the way to her house to deliver the transparent green bag.

¶ 25    The pertinent messages between Phillippi and defendant show that on the morning of March 5, 2019, defendant asked her if she wanted to go with him to Chicago, but she declined. The messages show her asking when defendant would return to her, and they quickly escalate into

an angry tirade after she learned that defendant had gone home to sleep and given one of the bags to Kellett. The text conversation corroborated the portion of Kristi's testimony that Phillippi went to her apartment to see defendant and got angry when Kristi would not allow her to. Also, included in the messages is a text where she states, "Here's the poison I supposedly took your stupid b*** mom doesn't know s*** so she should shut the f*** up calling me a liar!" preceded by a message without any content. Detective Eitel testified that the message with no content could represent that a photograph was sent, which would corroborate Kellett's testimony about the photograph defendant had shown him.

¶ 26    On September 27, 2019, the trial court issued a memorandum of judgment finding defendant guilty of one count of drug induced homicide and two counts of delivery of a controlled substance. On October 29, 2019, defendant filed a motion to reconsider and/or for a new trial. On November 20, 2019, a hearing was held on defendant's motion and on sentencing. The trial court denied defendant's motion and sentenced him to nine years' imprisonment.

¶ 27    Defendant timely appealed.

¶ 28                                II. ANALYSIS

¶ 29    Defendant argues that the trial court erred in admitting the Verizon cell phone records as self-authenticating business records and allowing Detective Eitel to testify to their contents, because Connors's correlating certification was not made under oath subject to the penalty of perjury as required by Rule 902(11). Defendant argues that, as such, the records were not self-authenticating and that the State did not otherwise establish the necessary foundation to admit the Verizon records as business records under Rule 803(6).

¶ 30                                A. Forfeiture

¶ 31    As a preliminary matter, the State argues that defendant forfeited the issue of whether

Connors's certification satisfied the requirements of Rule 902(11). The State maintains that defendant's objection to its motion *in limine* was made as to the form of the certification, with counsel noting that it was not notarized, contained nothing from a guarantor nor any signatory confirmation, and that it appeared "to be just a form that was generated on his computer." The State argues that this is not the same issue as whether the certification satisfied Rule 902(11). Further, the State argues that defendant's subsequent objection at trial was made "for the record" and did not sufficiently raise the issue that is presented on appeal. The State argues that, likewise, defendant's posttrial motion merely stated, "This Court erred in admitting into evidence the text messages allegedly between Kane Kellett and the Decedent and between the Decedent and the Defendant."

¶ 32    "It is well settled that, to preserve an issue on appeal, a defendant must object to the purported error at trial and include it in his written posttrial motion." *People v. Glasper*, 234 Ill. 2d 173, 203 (2009). "This court's forfeiture rules exist to encourage defendants to raise issues in the trial court, thereby ensuring both that the trial court has an opportunity to correct any errors prior to appeal and that the defendant does not obtain a reversal through his or her own inaction." *People v. Denson*, 2014 IL 116231, ¶ 13. However, forfeiture is a limitation on the parties rather than the court, and a reviewing court may consider a forfeited argument. *People v. Sophanavong*, 2020 IL 124337, ¶ 21.

¶ 33    The State is correct that, in order to preserve an issue for appeal, an objection must specifically identify the grounds for the objection and that boilerplate language cannot be used as a catch-all to preserve issues for appeal. *People v. Smith*, 139 Ill. App. 3d 21, 27 (1985). However, "[a]n issue raised by a litigant on appeal does not have to be identical to the objection raised at trial, and we will not find that a claim has been forfeited when it is clear that the trial court had the

opportunity to review the same essential claim." *People v. Lovejoy*, 235 Ill. 2d 97, 148 (2009). While defendant may not have specifically argued that Connors's certification failed to satisfy the requirements of Rule 902(11), the trial court had an opportunity to review the issue and found that the certification did satisfy the under oath subject to the penalty of perjury requirement of Rule 902(11). Accordingly, we will consider the merits of defendant's argument.

¶ 34                          B. Admissibility Under Rule 902(11)

¶ 35    The admissibility of evidence is within the discretion of the trial court and its decision will not be disturbed absent an abuse of discretion. *People v. Pikes*, 2013 IL 115171, ¶ 12. "An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court." *Seymour v. Collins*, 2015 IL 118432, ¶ 41. However, to the extent that this appeal involves the proper interpretation of Rule 902(11), this presents a question of law, and our review is *de novo*. *People v. Craigen*, 2013 IL App (2d) 111300, ¶ 41.

¶ 36    Rule 902(11) states:

"Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following:

* * *

The original or a duplicate of a record of regularly conducted activity that would be admissible under Rule 803(6) if accompanied by a written certification of its custodian or other qualified person that the record

(A) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of these matters;

(B) was kept in the course of the regularly conducted activity; and

(C) was made by the regularly conducted activity as a regular practice.

The word 'certification' as used in this subsection means with respect to a domestic record,

a written declaration under oath subject to the penalty of perjury ***." Ill. R. Evid. 902(11)

(eff. Sept. 28, 2018).

¶ 37    Defendant argues that Connors's certification was deficient, as it does not indicate that Connors's statement was under oath subject to the penalty of perjury. Defendant acknowledges that, while Rule 902(11) does not explicitly require evidence of the actual administration of an oath, it does require a declaration under oath subject to the penalty of perjury. Defendant maintains that the certification at issue does not contain such a declaration, nor does it contain any evidence from which it can be inferred that Connors was under oath, such as a notarization.

¶ 38    "A person commits perjury when, under oath or affirmation, in a proceeding or in any other matter where by law the oath or affirmation is required, he or she makes a false statement, material to the issue or point in question, knowing the statement is false." 720 ILCS 5/32-2 (West 2018). "[A]n oath that is not administered by a person empowered to administer oaths will not support a charge of perjury." *Weydert Homes, Inc. v. Kammes*, 395 Ill. App. 3d 512, 519 (2009).

¶ 39    The Oaths and Affirmations Act (Act) (5 ILCS 255/1 *et seq.* (West 2018)) governs the administration of oaths. Section 1 of the Act gives "[a]ll courts, and all judges and the clerk thereof, the county clerk, deputy county clerk, nota]aries public, and persons certified under the Illinois Certified Shorthand Reporters Act of 1984" the power to administer oaths. *Id.* § 1. However, Connors's statement was made in New Jersey. Under section 6 of the Oaths and Affirmations Act, "[w]hen any oath authorized or required by law to be made is made out of the state, it may be administered by any officer authorized by the laws of the state in which it is so administered." *Id.* § 6. Title 41, section 2-1, of the New Jersey Statutes provides a list of officials authorized to

administer oaths in the state of New Jersey. N.J. Stat. Ann. 41:2-1 (West 2007).

¶ 40    Further, defendant maintains that the form of Connors's certification does not comport with the requirements in that the language of the certification indicates not that it was made subject to the penalty of perjury, but only that it was "sworn."

¶ 41    In support, defendant cites *Ulm v. Memorial Medical Center*, 2012 IL App (4th) 110421. In *Ulm*, the plaintiff had been employed with the defendant hospital in its health information management department. *Id.* ¶ 3 As part of the plaintiff's duties, whenever the department would release a record under subpoena, she was to certify that the record was complete and accurate and had been prepared in the regular course of the hospital's business. *Id.* ¶ 4. After the hospital implemented a new electronic record system, the plaintiff refused to certify outgoing records, because she believed that the new system jeopardized the accuracy of the records. *Id.* ¶ 44. The plaintiff was then terminated, and she filed a claim for retaliatory discharge and violation of the Whistleblower Act (740 ILCS 174/1 *et seq.* (West 2006)). *Ulm*, 2012 IL App (4th) 110421, ¶¶ 9-10. After the trial court granted the hospital's motion for summary judgment, the plaintiff appealed. *Id.* ¶¶ 11-12. On appeal, the court considered whether the certifications the plaintiff was being asked to make, if false, would violate Rule 902(11). *Id.* ¶ 32. The *Ulm* court ultimately concluded that the plaintiff had not claimed that the certifications were made under oath subject to the penalty of perjury and that the relevance of Rule 902(11) to her Whistleblower Act claim was dubious. *Id.*

¶ 42    Defendant maintains that the holding in *Ulm* supports that, because Connors's certification does not track the essential language, "under oath subject to the penalty of perjury," it is unclear whether the Verizon records are self-authenticating. We cannot agree with defendant's interpretation. The *Ulm* court said very little about Rule 902(11), essentially concluding that the plaintiff had failed to develop that claim. Further, the portion of *Ulm* that discussed tracking

essential language was addressing Rule 902(11) of the Federal Rules of Evidence, which does not contain the same definition of a certification as Illinois Rule of Evidence 902(11). See *id.* ¶ 31.

¶ 43    Finding little guidance from the case law, we turn to the rules of statutory interpretation. The same goals that govern statutory interpretation govern the interpretation of Illinois Supreme Court Rules. *People v. Campbell*, 224 Ill. 2d 80, 84 (2006). The primary goal of statutory interpretation is to ascertain and give effect to the intent of the legislature. *Ryan v. Board of Trustees of the General Assembly Retirement System*, 236 Ill. 2d 315, 319 (2010). The best indication of the legislature's intent is the plain language of the statute itself. *Id.* Where the statutory language is clear and unambiguous, it must be applied without resorting to additional tools of statutory interpretation. *Benzakry v. Patel*, 2017 IL App (3d) 160162, ¶ 74. "We are not at liberty to depart from the plain language and meaning of the statute by reading into it exceptions, limitations or conditions that the legislature did not express." *Petersen v. Wallach*, 198 Ill. 2d 439, 446 (2002).

¶ 44    The language of Rule 902(11) is clear that a certification has two elements. It must be (1) "a written declaration" made (2) "under oath subject to the penalty of perjury." Ill. R. Evid. 902(11) (eff. Sept. 28, 2018). Section 5 of the Oaths and Affirmations Act states:

> "All oaths, affirmations, affidavits and depositions, administered or taken as provided in this act, shall subject any person who shall so swear or affirm willfully and falsely, in matter material to any issue or point in question, to the like pains and penalties as are inflicted by law on persons convicted of willful and corrupt perjury." 5 ILCS 255/5 (West 2018).

Conversely, "an oath that is not administered by a person empowered to administer oaths will not support a charge of perjury." *Kammes*, 395 Ill. App. 3d at 519. "As liability for falsehood may

arise regardless of the wording of an oath, distinction among the types of oaths is not crucial." *People v. Audi*, 73 Ill. App. 3d 568, 570 (1979).

¶ 45    In the instant case, the certification began, "I Andrew M. Connors, being duly sworn, depose and say." The certification was not notarized, nor did it indicate to whom Connors had sworn. It was signed with a digital signature in the form of, "/s/ Andrew M. Connors."

¶ 46    The State maintains that, because the certification indicates that Connors was "duly sworn," it satisfied the requirements of Rule 902(11) and that Rule 902(11) does not require evidence showing the actual administration of an oath. In support, the State cites our decision in *People v. Curry*, 2020 IL App (2d) 180148, for the proposition that Rule 902(11) does not require that a certification track the specific language of Rule 902(11) to be effective. We disagree that *Curry* stands for this proposition. In *Curry*, the defendant objected broadly that Facebook messages admitted into evidence did not constitute business records for the purposes of Rule 803(6). *Id.* ¶ 49. To the extent that we considered Rule 902(11), it was to determine whether the certificate submitted by Facebook's custodian of records satisfied the foundational requirements for business records under Rules 803(6) and 902(11). *Id.* ¶ 52. We did not consider the issue of whether the certification satisfied the requirements that the certification be made in writing under oath subject to the penalty of perjury.

¶ 47    Further, we disagree with the State's assertion that Rule 902(11) does not require evidence that an oath was administered. The purpose of Rule 902(11) is to provide an alternate means of establishing a proper foundation for business records, without the need for a representative of the business to testify in court. "Basic evidence rules require a proponent of documentary evidence to lay a foundation for the introduction of that document into evidence, and evidence must be presented to demonstrate that the document is what its proponent claims it to be." *Koulogeorge v.*

*Campbell*, 2012 IL App (1st) 112812, ¶ 34. Rule 902(11) provides an alternative method for laying that foundation, but the duty still lies with the proponent of the document (in this instance, the State) to provide sufficient evidence to establish that the document is what it is claimed to be.

¶ 48    We find our decision in *Kammes* to be instructive in this matter. In *Kammes* we considered whether the plaintiff's contractor's statement satisfied the requirements of section 5 of the Mechanics Lien Act (770 ILCS 60/5(a) (West 2006)), which required "a statement in writing, under oath or verified by affidavit, of the names and addresses of all parties furnishing labor, services, material, fixtures, apparatus or machinery, forms or form work and of the amounts due or to become due to each." The plaintiff submitted a document that began, " 'The affiant, Brian Weydert, being duly sworn on oath deposes and says that he is the President of Weydert Homes, Inc. and the General Contractor for the construction of a single-family residence in Wheaton, IL, owned by Rick Kammes.' " *Kammes*, 395 Ill. App. 3d at 517. Below the contractor's signature were the typewritten words, " 'Subscribed and Sworn to before me this 31st day of October 2006,' " next to which was a blank line with the word " 'Seal' " typed beneath it." *Id.* The plaintiff argued that, because the document recited to be "duly sworn on oath," it satisfied the requirements of the Mechanics Lien Act and that a jurat or certificate of the officer administering the oath was not required, as it could be proved through parol evidence. *Id.* at 519. We held that the contractor's statement did not satisfy the requirements of the Mechanics Lien Act, because the statement contained no notary's signature or seal and the plaintiff had failed to present any evidence that an oath had otherwise been administered. *Id.*

¶ 49    In the instant case, we likewise have a document purporting to be "sworn" but which otherwise does not contain any indication that an oath was sworn or to whom it was sworn. Therefore, Connors's certification failed to comply with Rule 902(11), and the trial court abused

its discretion by admitting the Verizon records into evidence.

¶ 50    In preparing this disposition, we examined the records in other cases involving Rule 902(11) certifications and found that oftentimes the custodian would prepare a certification that complied with only the federal requirements. We caution trial courts and proponents of self-authenticating business records that, while the Federal Rules of Evidence allow for the admission of self-authenticating business records by means of a certification supported by an unsworn declaration under penalty of perjury, Illinois does not. See Fed. R. Evid. 902(11); 28 U.S.C. § 1746 (2018). Illinois Rule of Evidence 902(11) differs significantly from Federal Rule of Evidence 902(11) in that it requires "a written declaration under oath subject to the penalty of perjury." Ill. R. Evid. 902(11) (eff. Sept. 28, 2018).

¶ 51                    C. Admissibility Through Circumstantial Evidence

¶ 52    The State argues that, even if Connors's certification did not satisfy the requirements of Rule 902(11), the Verizon records could be and were authenticated by circumstantial evidence. The State is correct that documentary evidence, such as text messages, may be authenticated by circumstantial evidence. *People v. Ziemba*, 2018 IL App (2d) 170048, ¶ 52. Factors to consider include "appearance, contents, substance, and distinctive characteristics, which are to be considered with the surrounding circumstances." *Id.* As such, a document "may be authenticated by its contents if it is shown to contain information that would be known only by the alleged author of the document or, at the very least, by a small group of people including the alleged author." *Id.*

¶ 53    The State maintains that Kellett's testimony was sufficient to authenticate the conversation that occurred between him and Phillippi. To that end we agree. However, even where the authenticity of a document is established, it must nevertheless fit with other rules of evidence, such as the hearsay rule. *People ex rel. Madigan v. Kole*, 2012 IL App (2d) 110245, ¶ 51. " 'Hearsay'

is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Rule 803(6) creates a hearsay exception for business records, and Rule 902(11) provides a method for providing a sufficient foundation for those records. Kellett's testimony cannot establish this foundation, as he cannot establish that the Verizon records were made in the regular course of business and that it was Verizon's regular practice to contemporaneously make such records. Ill. R. Evid. 902(11) (eff. Sept. 28, 2018). The State does not put forth any other hearsay exception that would allow for the Verizon records to be admitted. Accordingly, we cannot conclude that the Verizon records were otherwise admissible.

¶ 54                                    D. Harmless Error

¶ 55    The State argues that, even if the admission of the Verizon records was error, the error is harmless. As this case involves the admission of evidence and presents no constitutional error, the admission of the Verizon records is harmless only if there is no reasonable probability that the trier of fact would have acquitted defendant absent the error. *In re E.H.*, 224 Ill. 2d 172, 180 (2006).

> "[W]hen deciding whether error is harmless, a reviewing court may (1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." *People v. Becker*, 239 Ill. 2d 215, 240 (2010).

¶ 56    The parties agree that this case boils down to a credibility issue between Kellett and Kristi over whether defendant delivered the fatal bag to Kellett, which Kellett ultimately delivered to Phillippi. Defendant maintains that, as an admitted drug user and codefendant seeking leniency

from the prosecution, Kellett's credibility was questionable. Defendant further maintains that the Verizon records were crucial to the State's case in that they bolstered Kellett's credibility and that the trial court relied on those records to piece together "the actual occurrences and time frames" in the case. The State maintains that, while the text messages may have bolstered Kellett's testimony, it was Kristi's credibility that the court repeatedly found lacking.

¶ 57 "The testimony of an accomplice witness has inherent weaknesses, being testimony of a confessed criminal and fraught with dangers of motives such as malice towards the accused, fear, threats, promises or hopes of leniency, or benefits from the prosecution." (Internal quotation marks omitted.) *People v. Fane*, 2021 IL 126715, ¶ 45. Further, "the testimony of a narcotics addict is subject to suspicion due to the fact that habitual users of narcotics become notorious liars." (Internal quotation marks omitted.) *People v. Strother*, 53 Ill. 2d 95, 99 (1972).

¶ 58 That being said, while there are inherent weaknesses to Kellett's testimony, as the defendant's mother, Kristi was interested in the outcome of the trial, and that likewise goes to the weight to be afforded her testimony. See *People v. Flores*, 128 Ill. 2d 66, 106 (1989); *People v. Dean*, 226 Ill. App. 3d 465, 468 (1992).

¶ 59 The trial court has the superior vantage point from which to determine credibility, as it has the opportunity to observe and judge witnesses' demeanor and credibility, which we cannot do from the cold record. *Racky v. Belfor USA Group, Inc.*, 2017 IL App (1st) 153446, ¶ 107. The trial court in its memorandum found Kristi's memory to be "highly selective" and found her to be "less than credible." Based on the trial court's memorandum, this determination appears to be based not on the Verizon records, or the strength of Kellett's testimony, but rather on the weakness of Kristi's testimony. The trial court found that she was uncertain as to times and generally unaware of Kellett's whereabouts. Further, she did not contemporaneously advise the police or anyone else as

to defendant's overdose on the day at issue.

¶ 60    As defendant points out, the greatest effect of the admission of the Verizon records was that they bolstered or corroborated Kellett's testimony. That is, it was cumulative of the evidence already before the court. Kellett's testimony was already corroborated by Ohlson's testimony, as she described the bags purchased by defendant as either blue or green. She similarly described Phillippi's practice of using a pill bottle to transfer things to and from her room, and she testified that Phillippi had provided money for the purchase of the drugs. Kellett's testimony was likewise corroborated by the photo of the green bag retrieved from defendant's phone and the fact that only one green bag was recovered from Phillippi's room.

¶ 61    Likewise, the records of the conversation between Phillippi and defendant do not establish anything new. The messages showed that Phillippi got angry when defendant did not bring her the drugs she had paid for, went to confront defendant, but was not allowed to see him. She then sent the photograph of the bag Kellett had brought. However, there is evidence of these events from other sources. We know from Kellett and Ohlson that Phillippi provided money for the purchase of the drugs. We know from Kristi and Kellett that Phillippi was mad and wanted to talk to defendant. We know from Kristi and Roetling that Phillippi went to the apartment but was not let in. Finally, Kellett's testimony established the foundation for the photograph sent from Phillippi to defendant.

¶ 62    Accordingly, because the trial court's determination that Kristi's testimony was less than credible was not unreasonable, and because the Verizon records were cumulative of other properly admitted evidence, we conclude that the improper admission of the Verizon records was harmless error.

¶ 63                          III. CONCLUSION

¶ 64    For the foregoing reasons, the judgment of the circuit court of McHenry County is affirmed.

¶ 65    Affirmed.

---

**No. 2-19-1111**

---

| | |
|---|---|
| **Cite as:** | *People v. Hauck*, 2022 IL App (2d) 191111 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of McHenry County, No. 19-CF-399; the Hon. Robert A. Wilbrandt Jr., Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Sharifa Rahmany, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Patrick D. Kenneally, State's Attorney, of Woodstock (Patrick Delfino, Edward R. Psenicka, and Lynn M. Harrington, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

---